A QUAKER ACTION GROUP et al.,
Appellants

v.

Walter J. HICKEL, Secretary of
Interior, et al.

No. 23625.

United States Court of Appeals,
District of Columbia Circuit.

Argued on Motions Nov. 13, 1969.

Decided Feb. 10, 1970.

Motion for Reconsideration Denied
March 6, 1970.

Messrs. Joseph L. Rauh, Jr., James F. Fitzpatrick, and William A. Dobrovir, Washington, D. C., entered appearances on behalf of appellants. Messrs. Ralph J. Temple and Lawrence Speiser, Washington, D. C., were also on the pleadings for appellants.

Mr. Thomas A. Flannery, U. S. Atty., and Messrs. John A. Terry, Joseph M. Hannon and Gil Zimmerman, Asst. U. S. Attys., entered appearances on behalf of appellees.

Before McGOWAN, LEVENTHAL and MacKINNON, Circuit Judges.

## ORDER

PER CURIAM.

This cause came on for consideration on appellants' motion for summary reversal or for stay pending appeal, and on appellees' motion for summary affirmance, and the Court heard argument of counsel. On consideration of the foregoing, it is

ORDERED by the Court that the order of the District Court entered on November 6, 1969, appealed from herein, is reversed, and this case is remanded to the District Court with directions that said Court proceed to trial on an expedited basis, and it is

FURTHER ORDERED by the Court that the preliminary injunction entered in the District Court on April 26, 1969, as modified by this Court's opinion of June 24, 1969, 137 U.S.App.D.C. 176, 421 F.2d 1111 shall remain in effect pending conclusion of the trial in the District Court or until further order of this Court.

PER CURIAM:

This case involves an action instituted by several citizens groups seeking declaratory judgment that certain regulations of the Department of the Interior restricting picketing in front of the White House to 100 persons and in Lafayette Square to 500 persons are unconstitutional.

When this action [1] was previously before the court it approved a temporary injunction, pendente lite, that established a notice system enabling the government to avoid proposed picketing threatening the President's safety. A Quaker Action Group v. Hickel, 137 U. S.App.D.C. 176, 421 F.2d 1111. On the merits the District Court (June 24, 1969) granted the government's motion for summary judgment. Appellants seek summary reversal, the government a summary affirmance.

■ The District Court erred in adjudicating the issues in summary fashion. Summary judgment was granted partially on the basis of affidavits of Secret Service officials, submitted by the government, which enumerated factors pertaining to the safety of the President and integrity of the White House, which factors they believe justify imposing the restrictions in question. Thus at least one issue in this case is the perennial question of the reasonableness and validity of a regulation which impinges on the exercise of constitutionally protected rights. Second, it would appear that the issue raised by the allegations of discriminatory administration of the regulations is still a via-

---

1. The preliminary injunction granted by the District Court pending trial on the merits suspended the operative effect of the regulations in a finding that they were unconstitutionally violative of first amendment rights. This court declined to set aside the preliminary injunction, but modified it to permit the enforcement of the regulation to the extent of requiring that groups seeking to picket give notice fifteen days in advance. This arrangement contemplated that the government could thereafter seek injunctive relief on the basis of realistic concern for the safety of the President in the particular circumstances presented by any such notice.

ble one. We are guided in highlighting the second issue by the findings of the District Court in its earlier decision to grant a preliminary injunction to the appellant group before us. At that time the District Court found that the permit system had been subject to maladministration. Those findings were not negatived or superseded by any findings in the disposition on the merits.

Both of these issues are deserving of further exploration by the full processes of a trial on the merits, not simply by presentation of untested affiants' statements and lawyers' arguments. In this way, the issues may be clarified, substantiated, and resolved after having been subjected to the rigors of an evidentiary hearing. Nor is there any reason why this process of illuminating facts and issues should not go forward in an accelerated manner in the District Court. We further point out that this case is being returned to the District Court for a complete determination on the merits, for treatment as a *res nova*. Nothing this court has said or is saying should be taken as directed toward a decision of the issues on their merits, since all prior decisions have been directed at resolving the issue of preliminary injunctive relief only.

 This case cannot be disposed of by reference to a legislative authority to prohibit all picketing in front of the White House. For even assuming such legislation would be consistent with the Constitution, questions would arise whether that prohibiting authority has been delegated to the Interior Department, and further, whether it could be exercised by internal administrative action of subordinate officials rather than regulations duly exercised by the head of the cognizant department or agency. Moreover, a legislative authority to prohibit all picketing would not comprehend the power to authorize an administrative permit system that tolerated picketing for favored groups and denied it to others; obviously serious constitutional questions are involved in a regulation according such administrative latitude,

questions that are not eased by the findings of discriminatory application previously made in this action by the District Court. The authority to prohibit all picketing does not establish as a corollary the authority to establish unreasonable rules for determining which picketing will be permitted and which denied. It may be that the 100–500 criteria evolved by subordinate officials will be found to be reasonable and authorized, but that is to be determined after a hearing at which evidence, that may be tested on cross-examination, establishes the reasons for the regulatory provisions and the feasibility of others that provide satisfactory safeguards against violence with less interference with the right of peaceful protest.

The District Court expressly found that the 100–500 criterion was put forward in 1967 by the regional director of the National Park Service—not in a regulation or even public notice, but in an internal memorandum to subordinate officials administering the permit system —as a means of achieving traffic control and avoidance of damage to park greensward and shrubbery. We may assume that the consideration of need to avoid danger to officials, put forward in 1969, may be taken into account by the Park Service as a reason for continuing the standard. But that, too, must be subject to evidentiary testing, and cannot be taken on affidavits alone as a conclusive ipse dixit.

 In reversing, we are nullifying a decision which by summary judgment dismissed the action and dissolved the modified preliminary injunction then in effect. This process leaves a void in the critical area of providing security in the vicinity of the White House. It is obviously necessary that some interim rule be promulgated. We think that the limited findings as to the misuse of the permit system warrants reinstitution of the notice system delineated in the modified preliminary injunction. We choose the notice system not only because of the suspicion cast upon the earlier permit system, but also because the govern-

ment has not contended that the notice system is objectionable because of any of its administrative aspects, such as length of time required.[2] So far as we are now advised the notice system satisfies its contemplated objective of providing the government sufficient opportunity, at least during an interim period, to take preventative measures should the government feel that safety of the President is endangered. We reverse and remand with directions to proceed to trial on an expedited basis.

So ordered.

MacKINNON, Circuit Judge (dissenting):

The rising crescendo of national militancy and confrontation, with isolated instances of the preachment of assassination and violent revolution, brings this case to us because of the increasing extent to which the White House and Washington, D.C. have become the objective of such action. Such activities always contain the threat of political violence. The National Commission on the Causes and Prevention of Violence headed by Dr. Milton S. Eisenhower found in October, 1969 that

"The present decade, though by no means the worst in American history, has witnessed disturbingly high levels of assassination and political violence. * * * In comparison to the other nations of the world, the level of assassination in the United States is high."

To deal with a small segment of this threat, on August 10, 1967, limits on the size of gatherings were administratively established for the north sidewalk of the White House at 100 and for Lafayette Square across the street to the north at 500. This was done in exercise of the obligation imposed by applicable regulations [1] to issue offical permits upon proper application for public gatherings unless, *inter alia,*

(ii) The event will present a clear and present danger to the public health or safety.

(iii) The event is of such nature or duration that it cannot reasonably be accommodated in the particular area applied for. (36 C.F.R. § 50.19(c)(2) (1968) ).

In addition to the regulation, statutory obligations are also imposed by Congress upon the officials involved to protect the White House area and its occupants. See footnote 3, *infra.* The Superintendent of the National Capital Region, National Park Service, was designated as the issuing authority for permits. The regulations had previously set limits for the size of demonstrations at certain other public places and parks in Washington, D.C., which limits varied depending on available facilities and the size and character of the area.

Appellants' challenge here is twofold: First, they contend that a number of permit applications were not properly handled by the Superintendent, and Secondly, they contend the 100–500 limitations are unconstitutional. Both points are grounded in their rights to free speech, assembly and petition.

As to their first point, the stated reasons for denying the four applications

2. This is regarded by plaintiffs as a class action, and it was treated as a class action by this court in its prior opinion. The interim system in effect, pendente lite, has been treated by all parties as calling for notices by any group. The Government did not advance the claim that the injunction ran in favor of only plaintiffs, possibly in the thought that any such approach would be so productive of intervention applications and other litigation as to be counter-productive of effective processing of notices in the interest of peace and order.

1. The Regulations were promulgated by the Department of the Interior, National Park Service, and were constituted Part 50—National Capital Park Regulations, 36 C.F.R. § 50.19(c) (1968), enacted pursuant to 16 U.S.C. § 3 (1964), 39 Stat. 535; D.C.Code § 8–144 (1967), 35 Stat. 994.

for permits that are alleged in the complaint were (1) the first applicant refused to submit an estimate of the number of demonstrators, (2) the second application was for Lafayette Park which was then boarded up and closed for repairs, and the north sidewalk of the White House could not (safely) accommodate the (3) 1,000 and (4) 3,000 persons sought by the third and fourth applications. The Quaker Action Group has not made any application, allegedly because of the 100 person administrative limit for the sidewalk, and as to them we have no way of knowing for what size group they might have desired a permit. Complaint is also made of prior harassment and dilatory tactics by the Superintendent in handling some other permit requests.

The stated reasons for refusing the four permits were justifiable and reasonable under the regulation. As to the Quaker Action Group, they have no standing to complain since they have not filed any application and the size of their group is unknown. As to delay by the Superintendent in passing on applications for permits, that does not present any problem that could not be cured immediately by court action when administrative action on an application is not taken within a reasonable period of time. At least this relief would obtain as long as the present regulation is in effect.

That brings up the second point and face to face with the 100 and 500 limits for which plaintiffs request a declaratory judgment that same is an unconstitutional infringement on their rights of free speech, assembly and petition.

The regulation does not prohibit demonstrations but only regulates them by imposing limits on their size and by requiring a permit and prior notice of their character and size for the obvious purpose of permitting the security forces assigned to the White House area to protect its occupants and functions.

The District Court on April 25, 1969 granted a sweeping preliminary injunction prohibiting any enforcement of the entire regulation, 36 C.F.R. § 50.19 (1969), anywhere in the District of Columbia, and in addition struck down the 100–500 regulations, and enjoined interference with any of plaintiffs' proposed demonstrations.[2] This was drastic judicial action. It left the White House security forces wholly without any effective authorization for carrying out their assigned duties. The Government appealed immediately and a motions panel granted a stay of the District Court injunction but only until May 1, 1969. This was extended to May 2, 1969 by the merits divison and then on May 1, 1969 the merits division (Judge Burger dissenting) denied any further stay "effective 12:00 p.m. Friday, May 2, 1969," notwithstanding that the appeal was set for oral argument on May 9, 1969. This again was drastic legal action and it again left the White House, its occupants and functions without authorization considered necessary for their protection. It brought an appropriate response from the Hon. Earl Warren, Chief Justice of the United States, who, on May 2, 1969 stepped into this emergency and took the unusual action of ordering a stay of the District Court order "pending the determination of an appeal."

Subsequently the Court of Appeals affirmed the granting of the preliminary injunction and, having been alerted by the action of the Chief Justice to the emergency created by the trial court's injunction in the White House security, established, *pendente lite*, a 15-day no-

---

2. The trial court decision and order filed April 26, 1969 declared the 100–500 limits "on its face" to violate constitutional rights of free speech, assembly and petition, that 36 C.F.R. § 50.19 was invalid and void "on its face" for the same rea- sons and directed entry of a preliminary injunction enjoining interference with plaintiffs' proposed demonstrations, enjoining enforcement of the 100–500 limits and from "enforcing 36 C.F.R. § 50.19 (1968)."

tice system to replace the regulation. A Quaker Action Group v. Hickel, 137 U. S.App.D.C. 176, 421 F.2d 1111 (1969). The panel of the court (Burger, J., not participating) based their decision largely on the fact that they were not aware of any effort in the history of the United States "to assault a public figure by mass violence." This is an irrelevant narrow generalization devoid of any substantial application to the complicated problem of protecting the White House, its occupants and functions. The security forces at the White House are charged with the duty of protecting all occupants and functions there. For the White House security forces mass violence is just *one* problem, albeit one of increasing importance in the present political climate, and those charged with the responsibility of protecting the President do well to recognize it. And it is their statutory obligation to anticipate and provide protection against *every* possible danger. Actually crowds of substantial size served as the shield for the assassination of every U.S. President. Lincoln, April 14, 1865, theatre crowd; Garfield, July 2, 1881, railroad station crowd; McKinley, September 6, 1901, exposition crowd; Kennedy, November 22, 1963, motorcade crowd. The attempted assassinations of Theodore Roosevelt, October 14, 1912, and Franklin D. Roosevelt (President-elect) February 15, 1933, also occurred in speech crowds. On the preliminary injunction the two participating judges of our court stated that the Government to substantiate its regulation "must in fact show a danger and concrete reasons to expect *mass violence* to be directed toward the President in the future"—to *now* show that in the future there is a danger that entire groups will be preparing to storm the White House. Such decision completely ignores the danger from the means used by the Kennedy assassin, a sniper rifle with a telescopic sight. It ignores the lessons of history, since crowds have to some extent shielded each assassin of our Presidents.

At the hearing on the permanent injunction the Government submitted an extensive affidavit of the Director of the United States Secret Service, supplementing his affidavit filed at the hearing on the preliminary injunction.[3] This affidavit describes certain features of the security problem affecting the White House and the President, most of which would be self-evident to any informed person. It points out that the location and structure of the White House and its grounds and fences imposed certain limitations on the ability of the Secret Service to carry out their statutory mission. The rising climate of militancy forced them to choose between alternative security measures. They could either add certain physical protective devices, increase the security force, or impose limitations on adjacent demonstrations. The choice was made to regulate the size of demonstrations and require advance notice for permits. The number of demonstrators permitted in this area is related to the number that the Director of the Secret Service considers may be permitted with minimum hazard in view of existing physical structures and the number of available security personnel. The relationship between the crowd limits established and the Director's informed opinion establish the reasonableness of the regulation to accomplish the governmental purposes intended, *i. e.*, permit reasonable exercise

3. The Secret Service is the federal agency primarily responsible for the protection of the President of the United States and the members of his immediate family (18 U.S.C. § 3056) and the Secretary of the Treasury has delegated to the Director of the Secret Service the responsibility for the supervision, control and direction of the White House Police (Treasury Department Order No. 173-3, No. 177-21) who are charged, under the supervision of the Secretary of the Treasury, with protecting the Executive residence and grounds in the District of Columbia, any building in which White House offices are located and the President and members of his immediate family (33 U.S.C. § 202).

of free speech and assembly consistent with carrying out its statutory duty to maintain an adequate security force to protect the White House, its occupants and contents.

Of course, more demonstrators could always be allowed but increasing the number of demonstrators requires the Government to augment its security forces depending on the degree of calculated risk they choose to assume. Any sizeable demonstration involves some risk. I consider the decision they made to be a reasonable one, that it was a decision the Government had to make in 1967 and that its basis is just as reasonable today and its reasonableness is now additionally supported by the Director's affidavit. I see no justifiable basis for judicial intervention to compel Congress and the Executive Branch of the Government to make a different choice within this area of governmental activity that is assigned to them than has been made by the statutes, regulations, appropriations and Executive decisions which together establish security policy for the White House and its adjacent areas. Especially when to do so could require an alteration of the security features or an increase in the security personnel of the White House, or lacking such improved security measures, cause an increase in the hazard to the White House and its occupants.[4]

Thus, considering the regulation to be a reasonable exercise of statutory duties imposed by Congress upon the Executive Branch of Government, I would affirm the decision of the District Court granting summary judgment.

I also consider that the District Court could properly grant summary judgment on a broader and more inclusive ground. In an opinion by Mr. Justice Goldberg involving a county court house, the Supreme Court has decided that a state statute prohibiting picketing or parades "near a building housing a court of the State of Louisiana" is constitutional. Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487, see also 536, 85 S. Ct. 453, 13 L.Ed.2d 471 (1965). Such prohibition was held to be a valid regulation of conduct and not to infringe on rights of free speech and assembly.

By statute Congress has also prohibited demonstrations on the Capitol grounds as follows:

It is forbidden to parade, stand, or move in processions or assemblages in said United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, except as hereinafter provided in sections 193j and 193k of this title. 40 U.S.C. § 193g, 60 Stat. 719.

This restriction was upheld by Jeannette Rankin Brigade v. Chief of Capitol Police, 278 F.Supp. 233 (D.D.C.1968), presently pending before a three judge court. See 137 U.S.App.D.C. 155, 421 F.2d 1090 (1969). Sections 193j and 193k referred to permit relaxation of the rule for the due observance of occasions of national interest.

---

4. The current situation, no doubt influenced somewhat by the prior handling of this matter by the courts, and also influenced by a demand to afford greater protection to foreign embassies (who have more statutory protection than does the White House), led the President on December 12, 1969 to send a letter to the United States Senate requesting creation of a new Executive Protection Service with responsibility for protection of the White House, Presidential Office Buildings, the President and his family and foreign diplomatic missions both here and anywhere else in the United States the President may direct. The 274-man White House police force would be increased to 300 police officers and 95 Secret Service personnel by next June and to an 800-man total by June, 1971. Also added would be 42 police cars. Thus, as court decisions increase the hazard at the White House, the Congress and the Executive must increase their expenditures for protective forces. The cost of this proposed increase, exclusive of operating costs, would run upwards of $10 million annually.

Demonstrations on the Supreme Court grounds have been similarly prohibited:

> It shall be unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement. 40 U.S.C. § 13k, 63 Stat. 617.

Finally, the District of Columbia statute making it unlawful to picket or congregate within 500 feet of any "foreign embassy, legation or consulate" in the District of Columbia, D.C. CODE § 22–1115, 52 Stat. 32, was upheld against contentions similar to those raised here. Frend v. United States, 69 App.D.C. 281, 100 F.2d 691 (1938).

Recognizing the holding in Cox v. Louisiana, *supra*, and the Appeals Court decision, that it is proper to prohibit picketing and congregating within 500 feet of a foreign embassy, it seems obvious that the statutes prohibiting picketing on the grounds surrounding the Capitol and the Supreme Court are valid. It would accordingly be perfectly proper on such authority for a statute or regulation to prohibit all picketing and congregating at the White House because as all know it is a national nerve center containing vital links to our national security in addition to housing the President and his staff. The importance of these elements to our national security continues night and day and cannot be ignored. In fact, in some circumstances it might be just as important to protect the White House and its communications system as to protect the President. There are just as strong reasons for *prohibiting* picketing and large assemblages at the White House as there are at the Capitol and the Supreme Court, but the Government has not elected to do so. Instead the decision was made to *regulate* picketing and assembly by a permit system and by placing limits on the size of demonstrations. Since picketing and congregating by demonstrating groups could be prohibited entirely, the imposition of the 100–500 limit is clearly reasonable. The greater power includes the lesser. The Executive branch is clearly within its rights in imposing some limitation on the number of demonstrators permitted at the White House and Lafayette Park area.

Certainly, if picketing and demonstrations can be *prohibited* at county court houses in Louisiana, within 500 feet of foreign embassies in the District of Columbia, and on the grounds of the Capitol and Supreme Court, there is no question of the right to *regulate* picketing and demonstrations in the vicinity of the White House or of the reasonableness of imposing the 100–500 limit on the number of White House demonstrators and requiring permits.

In connection with any regulation drawn on this subject, it must always be recognized that the right must be reserved in the Government to deny a permit to any person or group that intelligence they consider to be reliable indicates would present a clear danger to the White House, its occupants or environs. To do otherwise would be a violation of the statutory duty imposed upon the officials involved. Thus, in cases where groups of potential demonstrators contain any individual who preaches violence or revolution or has extreme attitudes on confrontation, very difficult problems are presented to the security forces guarding the White House and courts must recognize that obvious fact in the extent to which they would upset Executive action in such matters. We all wish to recognize and encourage the rights of our citizens to express their views on governmental matters but we should not be oblivious to the obvious hazards created by large gatherings of protesting demonstrators in these times. I would take judicial notice of the three assassinations of national public men that have taken place in recent years and of the widespread political violence that is being advocated all about us and permit the assigned security forces to carry out what are reasonable regula-

tions clearly designed to carry out their statutory duties.

I conclude that the regulation, the limits fixed, the permit system and the denial of the four questioned permits evidence a reasonable exercise of the power imposed on the particular officials and that the reasonableness of the administrative action in fixing the 100–500 limit is buttressed by the fact that it is an exercise of the minimal power *to regulate* and that no violations have occurred or are threatened of appellants' rights of free speech, assembly or petition. I would accordingly affirm the District Court.

PER CURIAM.

## ORDER

Having considered appellees' motion for reconsideration of this court's order of February 10, 1970, and for the issuance of a "further order" permitting enforcement of the Regulations of the Department of the Interior *pendente lite*, and the accompanying request for a stay of the mandate for seven days following action on such motion, and having considered appellants' motion for the mandate to issue forthwith; and there appearing no adequate reason why timely issuance of the mandate should not occur, or that there should be a reversion to the permit system *pendente lite*, it is

Ordered by the Court that the aforesaid motions are denied. The court, however, being of the view that the nature of the notice system should be clarified, directs that the order of February 10, 1970, be modified (1) to provide that the District Court is authorized and directed to implement the notice system by providing a form, which may be suggested by the Government, for the giving of notice of prospective demonstrations in which the sponsors shall furnish reliable estimates of the number of persons participating, the estimated duration of the demonstration, including the times proposed for its beginning and conclusion, and the character of the activity in contemplation, and (2) further to provide that the preliminary injunctive relief as

set forth in the order of February 10, 1970 does not extend protection to any persons sponsoring or engaged in activities not conforming to the notice given in such form.

Circuit Judge MacKINNON would grant appellees' motion.