**Patrick McL. DOUGALL et al., Plaintiffs,**

v.

**Jule M. SUGARMAN, Administrator of New York City Human Resources Administration and Harry I. Bronstein, City Director of Personnel, and Chairman of the New York City Civil Service Commission, Defendants.**

No. 71 Civ. 992.

United States District Court,
S. D. New York.

Nov. 9, 1971.

Mobilization for Youth Legal Services, Inc. (Lester B. Evens, Jeffrey G. Stark, New York City, of counsel), for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. State of New York (Joel Lewittes, Asst. Atty. Gen., of counsel), J. Lee Rankin, Corp. Counsel, New York City (Judith A. Gordon, New York City, of counsel), for defendants.

Before LUMBARD, Circuit Judge, and McLEAN and TENNEY, District Judges.

TENNEY, District Judge.

Plaintiffs are four of approximately twenty permanent resident aliens who, prior to December 28, 1970, were employed by private organizations which were merged into the New York City Human Resources Administration on that date. The City program was directed to the improvement of job skills among the unemployed and the underemployed. When the private organizations were merged into the City program, plaintiffs were hired by the City and assured their positions and salaries would be the same.[1] Shortly after their City employment commenced, however, plaintiffs were discharged pursuant to New York Civil Service Law § 53, subd. 1 (McKinney 1959), solely because of their alienage.[2]

On May 11, 1971, by order to show cause plaintiffs, alleging that Section 53 violated the Equal Protection Clause of the fourteenth amendment, the Supremacy Clause of the Constitution, and their right to travel among the states,[3] moved for the convening of a three-judge court and other relief. The single district judge, D.C., 330 F.Supp. 265, found plaintiffs raised a substantial constitutional question and recommended the convening of a three-judge court. Pursuant to the May 26, 1971 order of Chief Judge Henry J. Friendly, plaintiff's motions for declaratory judgment, injunctive relief and determination of class

action[4] were submitted to this statutory three-judge court which heard argument on July 13, 1971.[5]

The issues raised by the instant action were recently the subjects of Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), in which the Supreme Court held that state laws conditioning welfare assistance either on United States citizenship or, if the beneficiary was an alien, upon his having resided in the United States for a specified number of years were invalid. The rationale and holding of *Graham* control the outcome of plaintiffs' challenge to Section 53.

The fourteenth amendment provides "nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws", and the Equal Protection Clause has long been held to apply to aliens as well as citizens. *E. g.*, Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Of course, a state has traditionally been permitted to make classifications provided these have a reasonable basis. *E. g.*, Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Nevertheless, when a state's classification either impinges upon a fundamental right, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), or is based upon an inherently suspect classification such as race, nationality or alienage, that classification is subject to "close judicial scrutiny". *Graham, supra* 403 U.S. at 372, 91 S.Ct. 1848. Inasmuch as defendants have failed to demonstrate a

1. Plaintiffs Jorge and Vargas were employed as clerk-typists; plaintiff Castro as a senior human resources technician; and plaintiff Dougall as an administrative assistant in the staff development unit.

2. Section 53, subd. 1 provides:
   "Except as herein otherwise provided, no person shall be eligible for appointment for any position in the competitive class unless he is a citizen of the United States."

3. We have not found it necessary to reach the question whether aliens have a con-

stitutional right to travel among the states.

4. Plaintiffs' motion for class action determination is granted; the class shall consist of all permanent resident aliens residing in New York State who, but for the enforcement of Section 53, would otherwise be eligible to compete for employment in the competitive class of Civil Service.

5. Jurisdiction of this court is based upon 28 U.S.C. § 1343(3) and (4). Reference is also made to 42 U.S.C. §§ 1981 and 1983, 28 U.S.C. §§ 2201, 2281 and 2284.

compelling interest which would justify the classification created by Section 53, the statute violates the Equal Protection Clause of the fourteenth amendment.

The City and State attempt to justify their refusal to allow aliens the opportunity to compete for employment in the competitive class of civil service (hereinafter referred to as "CCCS") on two grounds: (1) a government is entitled to conduct its affairs through the agency of persons with undivided loyalty, and (2) Section 53 is properly related to efficient and stable government administration.

Since defendants neither elaborate on their loyalty argument nor contend that aliens, as persons with dual allegiance, are security risks,[6] it would appear that this justification is an application of the special public interest doctrine which is a phrase to describe the state's restricting the distribution of its limited resources to its own citizens. "Takahashi v. Fish & Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), however, cast doubt on the continuing validity of the special public interest doctrine *in all contexts*." *Graham, supra* 403 U.S. at 374, 91 S.Ct. at 1853 (emphasis supplied); *accord*, Purdy & Fitzpatrick v. State, 71 Cal.2d 566, 79 Cal.Rptr. 77, 456 P.2d 645, 657–658 (1969).

■ The Court in *Graham, supra* 403 U.S. at 374, 91 S.Ct. 1848, concluded that an alien's constitutional right to equal protection could not be made to depend upon the concept that government benefits were a privilege, not a right, which is the basis of the special public interest doctrine, see People v. Crane, 214 N.Y. 154, 164, 108 N.E. 427, 430, aff'd, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915), especially since resident aliens are subject to the same obligations as citizens, such as taxes and military service. *Accord*, Purdy & Fitzpatrick, 79 Cal.Rptr. 77, 456 P.2d at 656. The arbitrariness and unfairness of denying aliens the employment benefits of the City and State are even more apparent when one realizes that an alien who may have resided in New York for a number of years and contributed to its growth and development is denied the opportunity to compete for employment in CCCS whereas any *United States citizen* (vis-a-vis an American citizen residing in New York) who may not be or have ever been a New York resident and, accordingly, may not have made any contribution to it, is eligible for such employment. *Purdy & Fitzpatrick*, 71 Cal. 2d 566, 456 P.2d at 656. Therefore, without a showing by defendants that the "loyalty" requirement bears a relationship to a compelling interest of the City and State, it violates the Equal Protection Clause.

■ The second justification for Section 53—that it is properly related to efficient and stable government administration—also does not withstand "close judicial scrutiny". Defendants contend that an alien is less likely to remain in the United States during his employment life than is an American citizen and, thus, if an alien is hired into a "career" position of CCCS, a decision to return to his homeland will adversely affect the efficiency and stability of the administration of the governments of the City and State. However, this argument of

---

6. Defendants would be on particularly shaky ground if they were to argue that aliens were ineligible for employment in CCCS because they are security risks. In fact, defendant argued in support of Section 53's validity that plaintiffs, as aliens, were eligible for other government employment in the generally higher paying and more responsible appointive positions, as well as in the labor class. *E. g.*, N.Y. Civil Service Law §§ 35, 41, 42 and 43 (McKinney 1959). Furthermore, Section 53, subd. 2 specifically allows the state to temporarily waive the citizenship requirements during a shortage of qualified citizens. In light of the availability of more responsible positions to aliens and that defendants may waive the citizenship requirements when it suits their needs, it would be incongruous to contend that aliens were denied employment in CCCS because their dual allegiance constituted a security risk to the City and State.

defendants is inapposite since it is primarily concerned with whether or not a "career" employee is likely to remain in the United States rather than in New York. There is no offer of proof on this issue and defendants would be hard pressed to demonstrate that a permanent resident alien who has resided in New York or the surrounding area for a number of years, as have plaintiffs, and whose family also resides here, would be a poorer risk for a career position in *New York* (vis-a-vis in the United States) than an American citizen who, prior to his employment with the City or State, had been residing in another state. Judicial notice can be taken of the mobility of today's society and of the numerous persons who flock to places such as New York City and Washington, D. C. for relatively short stays in order to gain valuable experience through government employment or for the adventure and glamour those cities offer. Inasmuch as the defendants do not attempt to distinguish among United States citizens in their hiring of "career" employees, their argument for discriminating against aliens is not valid. Assuming, *arguendo*, that it were valid, it still cannot withstand the requirements of the fourteenth amendment as enunciated in *Graham*.

■ This efficiency argument of the City and State is an economic one—if the defendants hire aliens into career positions and the aliens eventually quit and return to their homelands, new employees will have to be hired and trained to replace the experienced and therefore more efficient departed aliens; all of which costs defendants money. Again, however, as pointed out above in response to the "loyalty" argument, aliens pay taxes and often contribute to the welfare of the city and state in which they reside—certainly more than do American citizens residing in another state or section of the country and, therefore discriminating against aliens on economic grounds is particularly inappropriate. Furthermore, a state may not attempt to limit expenditures by creating invidious distinctions among persons within the state without violating the Equal Protection Clause, and the Supreme Court in *Graham, supra,* 403 U.S. at 375, 91 S.Ct. at 1853, so held: "[A] concern for fiscal integrity is no . . . justification for the questioned classification in these cases. . . . ."

■ Although *Graham* did not explicitly overrule two early Supreme Court cases, Crane v. New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed.2d 218 (1915); Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206 (1915), which are admittedly factually similar to the instant action and which upheld a New York statute prohibiting employment of aliens on public works, they are no longer controlling. In *Purdy & Fitzpatrick, supra,* the California Supreme Court was faced with a challenge to a statute virtually identical to that in *Crane* and *Heim* and unanimously held that the statute was violative of the Equal Protection Clause. In doing so, the court concluded that the original basis for the result in *Heim* was invalid and that recent developments in the law of equal protection had removed whatever validity *Heim* had at the time of its decision and that *Takahashi* warranted the rejection of such cases as *Heim* and *Crane*. If there were any doubt about the legitimacy of that California decision, it should have been put to rest by *Graham* which also strongly criticized the rationale of *Crane* and *Heim* and rejected it as a basis for denying welfare benefits to aliens. Taken together, *Graham* and *Takahashi* sufficiently weaken the value of *Crane* and *Heim* as precedents for upholding state laws denying aliens government employment and, therefore, those cases can be viewed as implicitly overruled and no longer law. That *Graham* did not explicitly overrule *Crane* and *Heim* can be viewed only as reflecting an intention to defer such action until faced with a proper factual setting in which states were given an opportunity to present their justifications for denying aliens employment opportunities. We are now faced with such a case and the

910

City and State have failed to offer sufficient justification for Section 53; accordingly, we have adopted the reasoning of *Graham* and hold Section 53 violative of the Equal Protection Clause.

In the opinion of this Court, Section 53 is also unconstitutional because it conflicts with the Supremacy Clause of the Constitution. Specifically, Congress has enacted a comprehensive plan for the regulation of immigration and naturalization and has granted to aliens through 42 U.S.C. § 1981 (1970) [7] the full and equal benefits of all laws in this country. "Moreover . . . [the Supreme Court] Court has made it clear that . . . aliens lawfully within this country have a right to enter and abide in any State in the Union 'on an equality of legal privileges with all citizens under non-discriminating laws.' Takahashi, 334 U.S. at 420, 68 S.Ct. at 1143, 92 L.Ed. 1478." *Graham, supra*, 403 U. S. at 377–378, 91 S.Ct. at 1855. Relying on these premises, the court in *Graham* concluded that state laws restricting the eligibility of aliens for welfare assistance solely because of their alienage conflicted with the federal policy and hence were unconstitutional. Section 53 is invalid for these same reasons.

In Truax v. Raich, 239 U.S. 33, 42, 36 S.Ct. 7, 11, 60 L.Ed. 131 (1915), the court reasoned:

"The authority to control immigration —to admit or exclude aliens—is vested solely in the Federal Government. . . . The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as chose to offer hospitality." *Accord, Graham, supra*, 403 U.S. at 379, 91 S.Ct. 1848.

In quoting the above language from *Truax* with approval, the court in *Graham, supra* at 380, 91 S.Ct. at 1856, held:

"State alien residency requirements, that either deny welfare benefits to noncitizens or condition them on long-time residency, equate with the assertion of a right, inconsistent with federal policy, to deny entrance and abode. Since such laws encroach upon exclusive federal power, they are constitutionally impermissible."

Just as the laws in *Truax* [8] and *Graham* equated with a right in the states to admit and exclude aliens, an exclusively federal right, Section 53 encroach-

---

7. 42 U.S.C. § 1981 (1970) provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to . . . the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . ."

This provision was previously 8 U.S.C. § 41, a section of that title of the United States Code dealing with Aliens and Nationality. It is also clear that 8 U.S.C. § 41 extended to aliens as well as citizens. Takahashi, 334 U.S. at 419, 68 S.Ct. at 1142.

8. There is language in *Truax*, 239 U.S. at 41, 36 S.Ct. 7, which implies that states may deny some employment opportunities to aliens without invading this exclusive federal authority as long as it does not foreclose nearly the entire field of industry. Defendants then argue that since they employ only about 5 per cent of the state workforce, Section 53 is valid. However, the facts of Sailer v. Leger, the companion case to *Graham*, clearly demonstrate that a state law need have very little actual impact on aliens before it constitutes an impermissible encroachment upon the exclusive federal power to admit and exclude aliens. In *Sailer*, the class of persons actually affected by the denial of welfare assistance represented only 65–70 cases annually. Certainly Section 53 imposes at least as great an obstacle to the entrance and abode of aliens as did the statute in *Sailer*, since there are apparently in excess of 500,000 aliens residing in New York. Plaintiffs' Brief at 7.

es upon this exclusively federal power and denies aliens the "full and equal benefit of all laws for the security of persons and property". Since the federal government has preempted the field in the case of denying aliens welfare assistance, it has done so in the instant one. Any alien who would be discouraged from residing in a state because it either denied or conditioned upon long-term residency his right to welfare assistance would likewise be discouraged from residing in New York because of Section 53. Such an alien could logically conclude that his best or possibly his only opportunity for equal opportunity employment would be with the governments of the City and State, and to him Section 53 would constitute a serious obstacle to either his entrance and/or abode in New York. In fact, Section 53 could be viewed as reflective of a more pervasive state policy to discriminate against aliens and hence to have established additional artificial barriers to the entrance and abode of aliens.

In sum, Section 53 is tantamount to an assertion by New York City and the State of New York of the right to deny aliens entrance and abode—a right that is exclusively federal. Furthermore, Section 53 is clearly violative of 42 U.S. C. § 1981 (1970) in that it denies aliens the equal benefits of the laws of New York as are enjoyed by white citizens. In light of the language of *Graham*, this Court is constrained to find that Section 53 also conflicts with the Supremacy Clause and is unconstitutional, and enforcement of it will be enjoined.

Accordingly, plaintiff's motion for class action, preliminary and permanent injunctive and declaratory relief is hereby granted.

Settle order on notice.

LUMBARD, Circuit Judge (concurring).

I concur in Judge Tenney's opinion. The city and state have offered no justification for New York Civil Service Law § 53 that can stand in light of the Supreme Court's opinion in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). I think that the "special public interest" doctrine and the Court's earlier decisions in Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L. Ed. 206 (1915), and Crane v. New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed.2d 218 (1915), can no longer be viewed as controlling in light of the Court's language in Graham v. Richardson, *supra*, and Takahashi v. Fish & Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). Not only does Section 53 run afoul of the Equal Protection Clause, but it conflicts both with 42 U. S.C. § 1981 (1970) and the federal government's general power over the immigration and naturalization of aliens. *See* Graham v. Richardson, *supra*, 403 U.S. at 376–380, 91 S.Ct. 1848, 29 L.Ed. 2d 534.

While the question we decide today is an important one, it is equally important to recognize those areas into which the Court's holding does not extend. Nothing in our decision should be construed to mean that a state may not lawfully maintain a citizenship requirement for those positions where citizenship bears some rational relationship to the special demands of the particular position. There are some positions in the civil service, as in elective office, where broad policy decisions are made as a matter of course, and in such positions the state and the city, and their citizens, may properly require the officeholder to be a United States citizen.