**Mazhar JALIL, Appellant,**

v.

**Robert E. HAMPTON, Chairman United States Civil Service Commission.**

**No. 24640.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1971.

Decided March 8, 1972.

---

Mr. Robert Allen Sedler, University of Kentucky Law School, Lexington, Ky., with whom Messrs. Melvin L. Wulf, New York City, Lawrence Speiser and Ralph J. Temple, Washington, D. C., were on the brief for appellant.

Mr. Bruno A. Ristau, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, and Alan S. Rosenthal, Atty., Department of Justice, were on the brief, for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and ADAMS,* Circuit Judge, U.S. Court of Appeals for the Third Circuit.

ADAMS, Circuit Judge:

This case presents the questions whether the Civil Service Commission, consonant with the Fifth Amendment, may deny to a resident alien the opportunity to take the competitive examination for federal civil service employment, and whether appropriation acts may prohibit the use of appropriated funds to pay aliens employed in the civil service of the United States.

Appellant, Dr. Jalil, is a citizen of the Republic of India. On August 8, 1968, he was admitted to the United States for permanent residence. Two days later, he applied to the Civil Service Commission to be admitted to the examination for a Civil Service rating. The application was denied on the ground that, by its regulations, the Commission may accept applications only from citizens.

On September 22, 1969, Dr. Jalil filed a class action against the Chairman

---

* Sitting by designation pursuant to 28 U.S.C. § 201(a) (1970).

of the Commission[1] seeking declaratory relief that those portions of the regulations[2] which disqualify aliens are illegal and void and that any provisions in Congressional enactments[3] prohibiting the use of appropriated funds for payment of salaries of alien employees of the Executive Branch are also void. In addition, he sought injunctive relief ordering the Chairman to instruct the Commission and its staff that the regulations are void, that aliens must be admitted to competitive civil service examinations, and that there shall be no discrimination on the ground of alienage. In his complaint, Dr. Jalil stated he desired to be employed in forestry, agriculture or malaria control,[4] and did not desire to be employed in any position involving national security. He further stated that he was prepared to execute an oath of allegiance to the United States as a condition of employment.[5]

The Government moved to dismiss the complaint for failure to state a claim upon which relief could be granted and for failure to join indispensable parties.[6] Dr. Jalil cross-moved for summary judgment. The district court denied Dr. Jalil's motion for summary judgment and granted the Government's motion to dismiss.[7] This appeal followed.

Preliminarily, it should be noted that this is not a case involving the discharge of an employee already appointed to a federal position. In such a case, it has been held that the due process clause of the Fifth Amendment circumscribes arbitrary dismissals. Norton v. Macy, 135

[1]. Initially, we note that the Government has opened its argument by raising the "political question" doctrine as enunciated in Harisiades v. Shaughnessy, 342 U.S. 580, 588–589, 72 S.Ct. 512, 96 L.Ed. 586 (1951). However, in view of the analysis of that doctrine in Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), it does not appear that this matter is so purely "political" as to preclude a judicial determination of the rights of the parties.

[2]. 5 C.F.R. §§ 338.101, 302.203(g) (1971). These regulations do not forever bar Dr. Jalil from Civil Service employment. Should Dr. Jalil become a citizen of the United States, he would be eligible for appointment on the same terms as all other citizens.

[3]. See e. g., Public Works Appropriations Act of 1970, Pub.L. 91–144, § 502, 83 Stat. 336–337.

[4]. Dr. Jalil is an entomologist, and holds the degree of Doctor of Philosophy in Biology. At the time this suit was filed, he was employed as a research associate at the University of Kentucky, and is currently employed by the Department of Public Health of the State of Ohio.

[5]. The Government has argued that Dr. Jalil's willingness to take an oath of allegiance is a meaningless gesture because the United States is unwilling to accept such an oath as a substitute for the requirement that applicants and appointees be citizens. In view of the constitutional standards which may be applicable, however, it might be fruitful to consider whether regulations might not provide for the taking of an oath, and whether regulations which exclude only those resident aliens who refuse to take such an oath are enforceable.

[6]. A question has been raised as to the failure to join indispensable parties. Insofar as the case involves Civil Service Regulations beyond the power of the chairman to change, acting by himself, there may be a requirement for joinder of the other members of the Commission. See Adamietz v. Smith, 273 F.2d 385 (3d Cir. 1960); Davis v. Tennessee Valley Authority, 214 F.Supp. 229 (N.D.Ala.1962), aff'd 313 F.2d 959 (5th Cir. 1963); Wallace v. Semrow, 206 F.Supp. 270 (N.D.Ill.1962). However, Fed.R.Civil P. Rule 21 permits parties to be "added by order of the court on motion of any party or of its own initiative at any stage of the action * * *". Insofar as the complaint attacks a Congressional enactment on its face, the Department of Justice or the Attorney General should have been named as a party defendant. It appears from the record, however, that both the Justice Department and United States Attorney defended this action in the court below. On remand, the district court will be able to cure these deficiencies.

[7]. In a similar case, the Government's motion to dismiss was granted by the District Court for the Northern District of California. See Mow Sun Wong v. Hampton, 333 F.Supp. 527 (filed August 31, 1971).

U.S.App.D.C. 214, 417 F.2d 1161 (1969). Nor does this action involve the exercise of control over a federal employee. In such situations the power of the President may not be absolute. *See* Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 610–613, 9 L.Ed. 1181 (1838). Rather, this case presents an attack on one facet of the power of the President to appoint federal employees.

■ The Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II, § 2, cl. 2. Federal courts "have no general supervising power" over the appointment of federal officials, and have been reluctant to impose restrictions upon the power of the President in this area. See Keim v. United States, 177 U.S. 290, 293, 20 S. Ct. 574, 44 L.Ed. 774 (1900).[8]

■ It is well settled by custom as well as by law that Congress may limit and has for many years limited the presidential power of appointment by specifying qualifications for the positions it has created. The civil service laws constitute one such restriction, and it is now generally accepted that these laws raise no constitutional questions.

We recognize that Dr. Jalil's complaint and argument raise a substantial issue as to the limits of the President's authority over the appointment of employees of the Executive Branch of the Government. However, because of the view we take of this case, it is not necessary for us to decide that question at this time.

The Civil Service Commission operates pursuant to an authorizing statute and to an Executive Order. The statute provides in part:

The President may—

(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service;

(2) ascertain the fitness of applicants as to age, health, character, knowledge and ability for the employment sought; and

(3) appoint and prescribe the duties of individuals to make inquiries for the purpose of this section. 5 U.S.C. § 3301 (Supp. VI 1970).

8. The Government contends that there is no "constitutional" protection to government employment except insofar as judicially enforceable rights may have been created by statute, citing, *e. g.*, Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46 (1950), aff'd by an equally divided court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1950). But the continued vitality of such view *is* at the very least, in doubt, because courts have subsequently held that government employees discharged for various reasons but who desired to retain government employment could be protected on the basis that the termination or threatened termination of their employment violates their constitutional liberties. *See, e. g.*, Meehan v. Macy, 138 U.S.App.D.C. 41, 425 F.2d 472 (en banc, 1969); Norton v. Macy,

*supra*; cf. United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); National Ass'n of Government Employees v. White, 135 U.S.App.D.C. 290, 418 F.2d 1126 (1969). Furthermore, the Supreme Court has indicated that there may be constitutional limits on the appointment power. *See, e. g.*, United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (dictum). *See also*, cases invalidating various statutory requirements obligating persons becoming government employees to take certain oaths, *e. g.*, Haskett v. Washington, 294 F.Supp. 912 (D.D.C., 3-judge court, 1968). Of course neither *Bailey* nor any of the other cases cited involve the issue of discrimination on the basis of alienage.

In accordance with that statute, the President has promulgated the following Executive Order:

\* \* \* The [Civil Service] Commission is authorized to establish standards with respect to citizenship, age, education, training and experience, suitability, and physical and mental fitness, and for residence or other requirements which applicants must meet to be admitted or rated in examinations. Executive Order 10577, § 2.1(a), 10 Fed.Reg. 7521 (November 22, 1954).

On the basis of this authority, the Commission has issued regulations providing:

(a) A person may be admitted to competitive examination only if he is a citizen of or owes permanent allegiance to the United States.

(b) A person may be given appointment only if he is a citizen of or owes permanent allegiance to the United States. 5 C.F.R. § 338.101 (1971).[9]

If the quoted regulation of the Commission exceeds the authority given it by the Executive Order, then it is invalid and may not be applied to exclude Dr. Jalil from the examination. Similarly, if the Executive Order exceeds its Congressional authorization, then it is inapplicable to the extent it is not in conformity with the Civil Service Act. See Cole v. Young, 351 U.S. 536 (1956). A decision that either the regulation or the order is beyond the authority of its issuer obviates the need to reach the constitutional question raised in this case [10] as to the regulations or Executive Order.

These matters were asserted by Dr. Jalil in paragraph 9 of the "Cause of Action" section and paragraphs 2 and 3 of the "Relief" section of his complaint, but because the district court dismissed the complaint without opinion, we are unable to determine to what extent that court considered these non-constitutional issues.

The ultimate determinations whether either the President or the Commission acted without authority are, of course, mixed questions of law and fact which are inappropriate for decision on this sparse record. No findings of fact are included in the district court's order dismissing the complaint. In particular, there are no findings pertinent to the question whether the exclusion of aliens from the Executive Branch will "best promote the efficiency of that service."

9. According to the Civil Service Commission, the phrase "owes permanent allegiance to the United States" has been interpreted to be applicable only to natives of American Samoa, and because it is not in issue here, we need not either indorse or overrule this interpretation. We do note, however, that if the interpretation of the phrase were broadened, the regulations would be accordingly narrowed.

10. If Dr. Jalil prevails in establishing that the Civil Service Commission Regulations exceed the authority provided by the Executive Order or by 5 U.S.C. § 3301, the court will then have to consider his allegations that the challenged provisions of the appropriations measures are unconstitutional. But it can give effective relief even before it comes to decide that constitutional question by providing for Dr. Jalil's examination and eligibility for appointment on Civil Service Registers. This relief would have significance even assuming arguendo that the appropriations measure is valid because Dr. Jalil could be appointed promptly upon his becoming a citizen if he is already on the Civil Service Register. On the other hand, if he has to wait before taking the examination until he has become a citizen, the factor of delay may be crucial in his getting a position even after becoming a citizen. Furthermore, the inquiry of the court into the constitutionality of the appropriations measure may be assisted by the analysis undertaken in order to decide the validity of the Civil Service Regulation.

We have no occasion to decide at this juncture whether there may be a jurisdictional objection that precludes consideration of the constitutionality of the appropriations measure before Dr. Jalil or some other member of his class has passed the examination and demonstrated qualification for appointment to the Civil Service Register.

■ Consequently, in the interest of the orderly administration of justice, this case will be remanded to the district court for consideration of these issues.[11] On the remand for the determination of the validity of the regulation, the district court may, of course, if it is necessary, decide the constitutional claims.[12]

After the district court dismissed the complaint in this case, the Supreme Court announced its decision in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). Although that decision is not squarely controlling here because it dealt with the states' power to discriminate against aliens

11. *See* Quaker Action Group v. Hickel, 139 U.S.App.D.C. 1, 3, 429 F.2d 185, 187 (1970), where this court reversed a summary disposition of a constitutional attack on Interior Department regulations, stating that the issues merited further exploration through a trial on the merits: "In this way, the issues may be clarified, substantiated, and resolved after having been subjected to the rigors of an evidentiary hearing. Nor is there any reason why this process of illuminating facts and issues should not go forward in an accelerated manner in the District Court." The court noted that the hearing would test "the reasons for the regulatory provisions and the feasibility of others that provide satisfactory safeguards" with less interference with rights having some constitutional protection.

Where the actual effect of a regulation is material, a remand—instead of a disposition that is either summary or based solely on the pleadings—provides an opportunity for an airing of the questions, at least where the issues are "substantial enough to require attentive examination by [the agency] and by the District Court in the context of a presentation of pertinent evidence." Allen v. Hickel, 138 U.S.App.D.C. 31, 37, 424 F.2d 944, 950 (1970). On remand there would be opportunity for the Civil Service Commission, when called upon to support its policies, of "perhaps modifying the policies on further reflection as to the interaction of the various interests properly taken into account." Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597, 603 (1969).

The possibility of a justification of a citizenship requirement in the regulations of the Civil Service Commission for the competitive civil service (or part thereof) is not eliminated, beyond need for attentive analysis, because the Commission's regulations do not apply to positions which have been excepted from the civil service. Whether those positions are of a "confidential or policy-determining character" (Schedule C), or not (Schedules A and B), they may be excepted only if "the Commission deter-

mines that appointments thereto through competitive examinations are not practicable." 5 C.F.R. § 6.1. In that event the responsibility for determining qualifications is vested not in the Commission but in the President or other executive officials. There is no indication, in pleadings, briefs or anything else that has come to our attention, that any such qualifications have been set so as to permit appointment of aliens. We therefore need not consider at this time the issue of possible appointment of aliens to some positions in the executive branch outside the permanent positions embraced in the merit system. This issue not only involves a separate constitutional question, as to the authority of the President to be untrammeled by statutory criteria in selecting key subordinates, but a different factual situation. Even if there is a bare possibility that the President, an elected official held to public account, may come, after the intense scrutiny within his cognizance, to vouch for the reliability and loyalty of aliens he appoints, the same considerations do not apply to those given the function of establishing criteria for the tremendous numbers in the competitive civil service. This plaintiff has not shown any interest in a position excepted from the competitive civil service and its protections. His action was expressly brought in behalf of the class of those "who desire to obtain *permanent* appointment through competitive examination in the Civil Service" (Complaint, para. 4), (emphasis supplied).

12. Another problem is presented by the procedural posture of this case. Although Dr. Jalil has sought a declaration that Congressional enactments prohibiting the payment of his salary, were he able to achieve his goal of Government employment, are unconstitutional, he has not requested injunctive relief prohibiting their enforcement. Nor has he requested the empanelling of a statutory three-judge district court which, under 28 U.S.C. § 2282 (1964), may be the only court with jurisdiction to grant the full relief which would be required, should he ultimately prevail.

*vis-a-vis* the Fourteenth Amendment and the federal power over the entrance and residence of aliens, it is nonetheless quite significant. The Court, in discussing standards applicable to the states, said:

> "[C]lassifications based on alienage, like those based on nationality or race are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority * * * for whom such heightened judicial solicitude is appropriate." *Id.* at 372, 91 S.Ct. at 1852 (footnotes and citations omitted).

The Court went on to hold that the special public-interest doctrine was not an adequate justification for the denial of welfare to aliens because the Court no longer bases constitutional decisions on the distinction between benefits which are rights and benefits which are privileges. *Id.* at 374, 91 S.Ct. 1848. In short, the states were required to justify such discrimination on the ground of a compelling governmental interest. *See id.* at 376, 91 S.Ct. 1848.

In Nielsen v. Sec'y of Treasury, 137 U.S.App.D.C. 345, 424 F.2d 833 (1970), which considered a federal regulation, this Court referred to the decisions invalidating state measures discriminating against aliens in the absence of special justification. *Nielsen* is inapposite because of the difference in the issues actually litigated, but it teaches that there is the need for a special showing by the federal government, just as there is a requirement of special justification by the states. The federal government has interests different from those applicable to the states, but nonetheless it must demonstrate that its interests justify the discrimination against aliens.

As to this justification, the language of Judge Lumbard, in his concurring opinion in Dougall v. Sugarman, 339 F. Supp. 906 (S.D.N.Y.1971), is instructive:

> "Nothing in our decision should be construed to mean that a state may not lawfully maintain a citizenship requirement for those positions where citizenship bears some rational relationship to the special demands of the particular position."

The district court must hear testimony, and make the underlying factual determinations and rulings on the validity of the Executive Order and regulation with the justification put forward.[13] The court will be able to determine the actual impact of the ban on aliens,[14] the number of aliens who might apply for federal positions, the number and type of positions for which citizenship might be a bona fide qualification, and the possibility that the Government's proper interests may be adequately safeguarded by a lesser restriction, which identified particular positions or classes of positions for which alienage might be a disqualification,[15] *e. g.*, on grounds of sensitivity or security.

13. The Government has noted that nearly every civilized country, with the exception of Ethiopia, excludes aliens from civil service employment. While it does not follow *a fortiori* from this that such discrimination is thereby valid under the United States Constitution or justified by a compelling state interest, the existence of this universal practice may be relevant to the issue of the reasonableness of the discrimination and whether appellant was denied due process of law.

14. The impact of the regulation is of particular, although not controlling, importance. In Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), the state statute there invalidated purported to deny plaintiff the right to fish in California off-shore waters, and thereby to deny to him and the members of his class their traditional means of livelihood. Similarly, the impact of the state statutes ruled unconstitutional in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), was that the plaintiffs were being deprived of the very necessities of life: food, clothing and shelter.

15. In this regard, the district court will be in a position to determine whether all Government employment constitutes a "common occupation of the country", or whether a limited number of jobs fall

On the basis of the record which will then be developed below, this Court will be able properly to decide the important questions presented in this litigation.[16]

Accordingly, this case will be remanded to the District Court for further proceedings consistent with this opinion.

BAZELON, Chief Judge (dissenting):

In my opinion, a remand to the District Court for a factual hearing in this case is not only unnecessary, but also embarks that court on the improper course of re-drafting invalid regulations on an ad hoc basis to make them comply with the Constitution. I must therefore respectfully dissent from the majority's decision.

The Civil Service regulation which excludes all aliens from admission to competitive examination[1] violates the Constitution under the principles announced by the Supreme Court in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). In Graham, the Court held that classifications based on nationality or alienage are "inherently suspect" and must be subjected to close judicial scrutiny. Graham at 372, 91 S. Ct. 1848. Thus a compelling state interest, apart from the now discredited "special public interest" in dispensing financial benefits to citizens over aliens, must be found if such classifications are to be sustained under the Equal Protection Clause.[2] Graham at 376, 91 S.Ct.

1848. The principles announced in Graham apply fully to the federal government, Nielsen v. Secretary of Treasury, 137 U.S.App.D.C. 345, 424 F.2d 833 (1970), and protect an individual's opportunity for public employment as well as his interest in welfare payments, Dougall v. Sugarman, 339 F.Supp. 906, (S.D.N.Y.1971).

In Dougall v. Sugarman, supra, a three-judge panel struck down, without a factual hearing, a New York statute which excluded all aliens from the competitive class of the Civil Service, on the grounds that none of the interests which New York advanced were adequate justification for this classification under the standards of Graham v. Richardson. In the case before us, the federal government raises no different, or more compelling, interests. It is therefore inconceivable that the Government could establish a compelling state interest at a factual hearing to justify the exclusion of all aliens from all positions requiring the competitive Civil Service examination.

The only interest which could possibly rise to that level is the perceived necessity for employing persons of undivided loyalty in policy-making positions, or positions involving national security interests. But the weakness of this interest as a justification for the total exclusion of aliens from competitive positions becomes apparent upon examination of the

---

within that category. It may well be that the regulation is valid with regard to posts such as those involving national security or foreign policy, but not valid as to other Government jobs such as electricians, technicians, and the like. In order for the district court to pass on such questions, and ultimately for us to review them, a full factual record will be necessary.

16. This case has implications which may reach far beyond its own particular facts. If Dr. Jalil prevails, the hiring practices of every state, county and municipal government may ultimately be affected. In fact, cases involving similar issues have been the subject matter of recent litigation. See e. g., Dougall v. Sugarman, 339 F.Supp. 906 (S.D.N.Y. 1971), where a three-judge district court

held that the Constitution forbade New York State's prohibition against the employment of aliens by the City of New York. That decision is not squarely applicable here because the state's power over aliens is more limited than that of the federal government. However, any constitutional ruling limiting the power of the federal government to discriminate against aliens would likewise prohibit such discrimination by the states.

1. 5 CFR § 338.101(a).

2. It cannot be doubted that a federal law can impose impermissible discrimination, "so unjustifiable as to be a denial of due process." Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

entire text of the Civil Service regulations. These provide explicit exceptions for the employment of aliens.[3] Furthermore, positions in the highest branches of the Executive, and those of a "confidential or policy-determining character" constitute an "excepted service" which is exempt from the Civil Service regulations and to which it seems aliens might be appointed.[4] In view of the accessibility of these undeniably responsible positions to aliens, it is rather incongruous for the Government to maintain that there is still a compelling need to exclude them from the entire rank and file of the Civil Service because of their questionable loyalty. Accord, Dougall v. Sugarman, *supra*, 339 F.Supp. at 908, n. 6.

Even if some Civil Service positions *might* be foreclosed to aliens because of their sensitive nature,[5] it is neither proper nor possible for a District Court to undertake to identify those particular positions whose special demands make citizenship a compelling requirement. This is precisely the task which the Civil Service should perform, or else the District Court must suffer litigation on a case-by-case basis to determine the suitability of an alien for the type of job he seeks. Once the Civil Service attempts to set standards for the admission of aliens which reflect compelling governmental interests, courts can properly review them. But until then, there

is nothing to be learned on remand even remotely comparable to the factual issues this court remanded in Quaker Action Group v. Hickel, 139 U.S.App.D.C. 1, 429 F.2d 185 (1970) and the other cases cited by the majority in note 10, *supra*.[6] A regulation which simply excludes *all* aliens from *all* competitive positions on its face sets no standards, reflects no compelling interests, and is therefore invalid. We should not hesitate to say so.

Thus I find no merit to the majority's contention that a factual hearing must be held in the District Court in order to resolve appellant's constitutional attack on the Civil Service regulations. I detect an intimation in the majority's opinion that we should *forebear* ruling on this constitutional question, since the case can be disposed of on a non-constitutional ground—namely, that the regulations are an illegal extension of the authority delegated by Congress to establish requirements for employment in the Executive branch. The majority focuses on the issue of whether exclusion of all aliens "best promote the efficiency of that service." 5 U.S.C. § 3301(1).

It is clear to me, however, that this issue cannot be considered without taking full account of another Congressional enactment, the Public Works Appropriation Act, 1970, § 502, P.L. 91–144, 83 Stat. 336, which specifically provides for

3. In the absence of qualified citizens, 5 CFR § 338.101(b) (1), and other rare instances, 5 CFR § 338.101(b) (2).

4. *See* 5 CFR Part 213, particularly §§ 213.3101–.3394.

5. This possibility was noted by Judge Lumbard concurring in Dougall v. Sugarman and is quoted in the majority opinion above. The mere existence of this possibility apparently did not compel the court in *Dougall* to itself undertake the task of re-drafting the New York legislation to make it comply with the Constitution.

6. *Quaker Action Group* presented two important factual issues which the District Court had decided summarily—the constitutionality of a narrowly drawn prohibition on picketing in front of the White House and the question of its dis-

criminatory enforcement. Allen v. Hickel necessitated a factual inquiry into the religious purpose and effect of including a creche in the national Pageant of Peace. 138 U.S.App.D.C. 31, 424 F.2d 944 (1970). Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597 (1969) involved the denial of a permit to erect an antiwar display by the National Park Service. Remand was necessary since the very policies of the Park Service were unclear and thus could not be tested. In this case the Civil Service rule is perfectly clear, as are its purported justifications. I would adhere to the teaching of *Women Strike for Peace*: "It is not for this or any other court to construct guides for park use. The duty of the court is to assure our citizens that the Park Service has rules, or criteria, or guidelines." *Id.* at 603.

the exclusion of aliens from the federal payroll. This statute applies the same blanket exclusion of aliens from *all* positions [7] in the federal government, and will be of crucial weight in the determination of whether the Civil Service regulations are ultra vires.

Thus, the constitutionality of the Public Works Act must be considered by the District Court in the first instance, and it raises the same constitutional question I have outlined above. Graham v. Richardson applies with equal force to require "compelling" interests to justify exclusion of aliens from the entire federal payroll, and the Government has offered none.

Since confrontation of the constitutional question simply cannot be avoided or ignored, there is no judicial principle or practice which would have us remand the case to the District Court for an unnecessary and impermissable factual hearing.

On principles of law, I would reverse the decision below and hold both the Civil Service regulation and the Public Works Appropriation Act invalid.

7. Not all aliens are affected, since an exception is provided for "nationals of those countries allied with the United States in its current defense effort."