**A QUAKER ACTION GROUP et al.**

v.

**Rogers C. B. MORTON, Secretary of the Interior, et al., Appellants.**

**A QUAKER ACTION GROUP et al., Appellants,**

v.

**Rogers C. B. MORTON, Secretary of the Interior, et al.**

**Nos. 73–2061, 73–2190.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1974.

Decided Jan. 24, 1975.

As Amended Feb. 5, June 25, 1975.

---

6. See the definition of holding company in section 2 of the Act, 15 U.S.C. § 79b.

Joseph L. Rauh, Jr., and Ralph J. Temple, Washington, D.C., with whom James F. Fitzpatrick, Paul R. Smollar, William A. Dobrovir, Rosalind C. Cohen, Richard E. Earle, James M. Johnstone, John G. Murphy, Jr., Tracy A. Westen, Washington, D.C., and Melvin L. Wulf, New York City, were on the brief, for appellants in No. 73–2190 and appellees in No. 73–2061.

Gil Zimmerman, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, John A. Terry and Arnold T. Aikens, Asst. U. S. Attys., were on the brief, for appellants in No. 73–2061 and appellees in No. 73–2190. Earl J. Silbert, U. S. Atty., also entered an appearance for appellants in No. 73–2061 and appellees in No. 73–2190.

Before McGOWAN, LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

In March, 1969, A Quaker Action Group and other plaintiffs [1] filed suit in

1. Plaintiffs include five unincorporated associations and four individuals affiliated with these associations. Besides A Quaker Action Group, the plaintiff organizations are the

District Court seeking a declaratory judgment that regulations governing public gatherings in the White House area are unconstitutional, and a permanent injunction against their enforcement by the Department of the Interior. Since then, this troublesome litigation has dragged on well nigh interminably. This opinion marks the fourth appearance of the case in this court; we have previously affirmed an initial grant of preliminary injunction against the regulations,[2] and have twice reversed summary judgments and remanded the case for trial of the factual issues.[3] Now, at long last, the trial has been held, and we have before us cross-appeals from the trial judge's findings and conclusions.[4] For reasons set out below, we affirm the decision of the District Court, although with several qualifications.

## I. BACKGROUND

Because the course of this litigation has been detailed in our three previous opinions, we shall merely sketch its background here, to give a frame of reference for our consideration of the decision below.

1. On August 10, 1967, the National Park Service (NPS) decided to enforce an existing, but long neglected requirement that individuals obtain a permit prior to use of National Park areas in the District of Columbia for public gatherings.[5] The Regional Director of the National Capital Parks Division communicated this determination by an internal memorandum (the "Jett Memorandum") directed to the Chief of the Park Police and to the Director of the Central National Capital Parks.[6] In the memorandum, the Park Service also announced a new internal policy of refusing permits for use of the White House sidewalk (the sidewalk on the south side of Pennsylvania Avenue between East and West Executive Avenues) by groups exceeding 100 persons, and for use of Lafayette Park by groups exceeding 500 persons. Neither of these numerical restrictions was then a part of the regulation being reactivated by the memorandum.

2. Thereafter, in the spring of 1969, the plaintiffs, five organizations wishing to hold demonstrations on the White House sidewalk or in Lafayette Park,[7] filed their action in the District Court. After an initial hearing on a request for a preliminary injunction, the District Court concluded that the numerical restrictions were not reasonably related to the achievement of substantial governmental interests, that the permit system conferred unduly broad discretion on officials to deny permit applications, and that the permit system in fact had been administered in "an arbitrary, capricious and harassing manner."[8] Accordingly, the District Court issued a preliminary injunction against enforcement of the permit requirement.

Clergy and Laymen concerned about Vietnam, The Women's Strike for Peace, Jews for Urban Justice, and the Action Committee on American-Arab Relations.

2. A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969) (Quaker Action I).

3. A Quaker Action Group v. Hickel, 139 U.S.App.D.C. 1, 429 F.2d 185 (1970) (Quaker Action II); and A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 460 F.2d 854 (1971) (Quaker Action III).

4. A Quaker Action Group v. Morton, Civil Action No. 688–69, 362 F.Supp. 1161 (D.D.C. 1973).

5. The regulation is found at 36 C.F.R. § 50.19 (1973) and is set forth in the Appendix to this opinion.

6. Plaintiff's Exhibit 30–J Pl.A. at Tab 27.

7. Each of the groups except Quaker Action requested a permit. The permits were denied by the National Park Service (Park Service) as relevant agent for the Department of the Interior. Quaker Action alleged that it had not applied for a permit out of its apprehension that the Park Service would arrest its demonstrating members if their numbers exceeded the limitations in the regulations. *See* Quaker Action I, supra note 2, 137 U.S.App.D.C. at 179–180, 421 F.2d at 1114–1115.

8. A Quaker Action Group v. Hickel, Civil Action No. 688–69 (D.D.C.April 25, 1969), Conclusions of Law at 1–3.

3. *Quaker Action I.* On appeal, we affirmed the issuance of the preliminary injunction, and ordered that the case proceed to trial expeditiously.[9] But in view of the seriousness of the governmental interests at stake, particularly the security of the President and the White House, we modified the injunction so that its protection extended to groups wishing to hold a public gathering in the White House area only if they gave the NPS at least 15 days notice of their gathering.[10] As we then noted, our modification was designed to give the government sufficient opportunity to seek a temporary restraining order against any demonstration reasonably felt to present a particular danger to the safety of the President, an opportunity the government has since invoked in some fourteen instances.[11]

4. After this initial decision, and notwithstanding our order that the case proceed to trial, the District Court granted the government's motion for summary judgment, relying upon the proffered affidavits of the Director of the Secret Service and other officials as to the need to protect the President and the White House.[12]

5. *Quaker Action II.* We reversed the summary judgment of the District Court, ruling that the plaintiffs had raised issues "deserving of further exploration by the full processes of a trial on the merits, not simply by presentation of untested affiants' statements and lawyers' arguments."[13] Accordingly, we remanded for a "hearing at which evidence, that may be tested on cross-examination, establishes the reasons for the regulatory provisions and the feasibility of others that provide satisfactory safeguards against violence with less interference with the right of peaceful protest."[14]

6. The District Court again granted summary judgment for the Government.[15] This new summary disposition apparently reflected the District Judge's belief that he had been deprived of discretion to review the regulations by the Secretary's repromulgation of the regulations after a formal rulemaking proceeding.[16] The judge buttressed his decision by reference to then recent outbreaks of violence in connection with demonstration activity around the country, including the Kent State incident.

7. *Quaker Action III.* Again we reversed the grant of summary judgment and remanded the case for trial.[17]

The opinion in *Quaker Action III* specifically considered the government's argument, accepted by the District Judge, that the court should accept any regulation issued by the Secretary that is both reasonable and supported by substantial evidence in an administrative record. We repeated our earlier holding that "the balancing of First Amendment freedoms against safety requirements re-

9. Quaker Action I, *supra* note 2.

10. *Id.*, 137 U.S.App.D.C. at 184, 421 F.2d at 1119.

11. Plaintiffs placed in evidence a table showing fourteen instances, occurring between September, 1969, and April 1973, in which the government sought to restrain demonstrations in excess of the 100/500 limitations contained in the then enjoined regulation. Plaintiff's Exhibit 46 Pl.A. at Tab 15. On one occasion the government marched up the hill, and after this court stayed an order of the district court the government obtained from the Supreme Court extraordinary relief to reinstate the district court injunction pendente lite, and then marched down the hill when it elected not to secure enforcement of the order it had obtained from the Supreme Court in the face of violations. *See* Quaker Action III, 148 U.S. App.D.C. at 355 n. 5, 460 F.2d at 863 n. 5.

12. A Quaker Action Group v. Hickel, Civil Action No. 688–69 (D.D.C.Nov. 6, 1969).

13. Quaker Action II, *supra* note 3, 139 U.S. App.D.C. at 3, 429 F.2d at 187.

14. *Id.*

15. A Quaker Action Group v. Morton, Civil Action No. 688–69 (D.D.C. November 9, 1970).

16. For a description of the Secretary's proceeding, see Quaker Action III, *supra* note 3, 148 U.S.App.D.C. at 348–349, 460 F.2d at 856–857.

17. Quaker Action III, *supra* note 3.

quire[s] the judgment of the court,"[18] and went on to elaborate as follows:

> In view of these vital [First Amendment] issues, we do not think it can be said that the validity of the regulations is established by the existence of substantial evidence in the administrative record that the Government officials had a reason for imposing a numerical restriction. The issues concerning the scope of the regulations and the need for their extent and restrictiveness are no closer to resolution now than they were when we first remanded for trial. The Secretary's reasons for re-adopting the 100/500 rule in 1970 are essentially the same as were previously adduced—a letter from the Director of the Secret Service which the Secretary stated he could not re-examine, phrased in terms similar to the affidavit previously submitted to the Secretary which we previously held was the type of untested assertion that could not support a summary conclusion upholding these numerical restrictions.
>
> . . . Of course the health and safety of the President are of concern to the citizenry. But this only poses, it does not answer, the question as to whether the officials involved have transformed this concern into an excessive preoccupation with security that is achieved at the unnecessary expense of First Amendment freedoms. We are aware that the issue is difficult and delicate. It is too difficult, too delicate, too dependent on careful assessment and weighing of constitutional rights, to rest conclusively on the untested declaration of an executive official.[19]

8. After this second remand, the matter came on for trial before Judge Hart between April 23, 1973, and May 2, 1973. Testifying on behalf of the asserted security justification for the restrictions were the Director and Deputy Director of the Secret Service, the Secret Service Agent in charge of White House security, Chief Wilson of the Metropolitan Police and Deputy Chief Beye of the Park Police. In turn, the plaintiffs adduced substantial evidence concerning lack of disruptions at past demonstrations, and expert testimony about crowd behavior. The judge also received testimony and other evidence about the other asserted justification for the permit system.

After this extensive hearing the District Court reached three conclusions: (1) It affirmed the need for a permit system and approved the existing permit regulation with a single modification. (2) It found that there had been no maladministration of the permit regulation. (3) It concluded that the 100/500 limitations were too restrictive of the First Amendment interests asserted by the plaintiffs, and that "[a]ny limitations of less than 750/3,000 would be more restrictive than is essential for the furtherance of [the asserted] governmental interests . . ." (District Court Conclusion 2).

The parties have taken cross-appeals, the government objecting to the raised numerical limitations, the plaintiffs objecting both to the imposition of any numerical limitations at all and to the approval of the permit system. Presumably our opinion in this case will be referred to as *Quaker Action IV*; hopefully, it will be the end of the line.

## II. REVIEW OF THE DISTRICT COURT DECISION

### A. *Basic Approach*

1. As we have stressed in our prior rulings, this case is not a normal review of an executive action or administrative proceeding. When the executive or the administrative process abridges constitutional rights, it is subject to closer scrutiny than otherwise, and ultimately it is the court rather than the agency that must balance the competing interests. The question in this case is not whether some support for the regulations may be adduced, by reference to evidence in the record and a claim of

18. 148 U.S.App.D.C. at 351, 460 F.2d at 859.

19. *Id.* at 352, 460 F.2d at 860.

reasonable inferences or concerns, but is whether the regulations at issue here are "unnecessarily restrictive for the purpose they are designed to serve." [20]

We now have, for the first time, a judicial determination based upon factual evidence adduced at a trial, indeed at a rather extensive and complete trial. To this determination we owe greater deference than to the untested administrative judgments with which we have been previously confronted. This decision being appealed was rendered by a district judge after consideration of both constitutional considerations, for which a judge has special concern, and the security considerations brought forward by the government officials. Moreover, the district judge had the benefit of the live testimony of the various witnesses whose assertions could be tested and probed on cross-examination. Thus, unless we discern clear error in the district court's findings of fact, or a mistake in its legal approach, we have no warrant for reversal.

It is in this spirit that we approach our review of the findings and conclusions made after the trial for which we waited so long.

2. In reviewing the District Judge's approval of the permit regulations, we start with the declaration of Mr. Justice Roberts in Hague v. C.I.O.:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.[21]

Moreover, as we pointed out in *Quaker Action III*, the right to use public parks for expression of ideas is of especial importance in the District of Columbia:

> The general concepts of First Amendment freedoms are given added impetus as to speech and peaceful demonstration in Washington, D.C., by the clause of the Constitution which assures citizens of their right to assemble peaceably at the seat of government and present grievances.[22]

We find it necessary to stress this basic proposition in view of the Park Service's continued approach to the use of local park areas for First Amendment activity. Indeed, in this case and others,[23] we have encountered a recurring Park Service theme that the use of parks for demonstrations is "not an appropriate use of Federally-owned park lands . . . ," [24] that such activity is not a part of the "basic mission" of the Park Service or that demonstrators are somehow not "bona fide" visitors to park sites.[25] This approach of the Park Service is rooted in a premise that is unacceptable.

The use of parks for public assembly and airing of opinions is historic in our democratic society, and one of its cardinal values. Public assembly for First Amendment purposes is as surely a "park use" as any tourist or recreational activity. It may be that certain parks can reasonably be reserved for specific park uses; First Amendment activity

20. *Id.*, citing Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); United States v. Robel, 389 U.S. 258, 268, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

21. 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

22. Quaker Action III, *supra* note 3, 148 U.S. App.D.C. at 351, 460 F.2d at 859.

23. *See, e. g.,* Women Strike For Peace v. Morton, 153 U.S.App.D.C. 198, 472 F.2d 1273 (1972) (Women Strike II); Women Strike For Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597 (1969); (Women Strike I); Jeannette Rankin Brigade v. Chief of Capitol Police, 342 F.Supp. 575 (D.D.C.1972), aff'd mem. 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972).

24. *See* Women Strike II, *supra* note 23, 153 U.S.App.D.C. at 200, 472 F.2d at 1275.

25. Deposition of William Failor, former Superintendent of National Capital Parks, at 60–61, 62–63 (quoted in Plaintiffs' Brief at 137 n. 248).

might be inappropriate for a wilderness area such as Yellowstone Park. We approve, however, the District Court's finding that the White House sidewalk, Lafayette Park, and the Ellipse constitute a unique situs for the exercise of First Amendment rights. (Finding 17). We therefore cannot accord deference to an executive approach to use of the White House sidewalk that is rooted in a bias against expressive conduct, or in the premise that such conduct is outside of—and on a lesser footing than—the "basic mission" of the Park Service.[26]

3. On the other hand, it is well-settled that expressive conduct is subject both to contemporaneous and to prior restraint under certain circumstances.[27] Obviously, conduct that creates a danger to life and property, or that is destructive of the public order, may be checked by authorities. In such situations, when the First Amendment rights of demonstrators compete with other legitimate interests, government may develop a system of restraints, on the otherwise protected conduct, that attempts to accommodate these various competing interests. In such cases, the proper course of government lies (1) in balancing the First Amendment rights against the other legitimate interests to arrive at a reconciliation that is both constitutional and an acceptable accommodation of all the factors; and (2) in constructing a scheme that does not risk abuse of First Amendment rights through a broad censorship power or other improper application of theoretically acceptable restraints.[28]

In undertaking to balance the competing interests in several of these cases the Supreme Court has adhered to certain general guidelines that have been summarized as follows:

> [R]estrictions on expression are valid if (1) the "[regulation] furthers an important or substantial governmental interest," (2) the "governmental interest is unrelated to the suppression of

26. The Government notes that the Interior Department has made national capital park sites available for demonstrations, citing *e. g.*, the "Prefatory Statement" of the Secretary of Interior, accompanying publication of revised 36 C.F.R. § 50.19 in proposed form on July 17, 1970 (35 F.R. 11485–92), reprinted in Addendum to the Government's brief, pages A 21 et seq.

This Prefatory Statement was prepared in the light of the pending litigation, and discusses the opinions of this court calling on the Service to undertake a reflective review of its policies. Its approach is reflected by the statements "The [National Park] Service's primary function, as set forth therein [16 U.S.C. § 1] is to aid the American people to achieve full and unimpaired enjoyment of the park values, including the scenery, the natural and historical objects, and the wildlife to be found in these national park system areas. . . . This basic National Capital Parks conservation policy is, of course, balanced against other considerations, including the consideration of fostering the expression of views in such areas."

In short, the Service recognizes that it must consider constitutional factors, but emphasizes that its statutory "park" mission is "primary" and "basic".

27. *See, e. g.*, United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 1678–1679, 20 L.Ed.2d 672 (1968) (and cases cited therein):

> This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.

This statement in *O'Brien* is essentially a restatement of the principle recognized in *e. g.*, Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), that public conduct is subject to regulation even though it is related to expression. The Government relies heavily on the *Cox* cases. But there is no issue that conduct is subject to regulation. The issue is whether the regulation is greater than is needed for the vindication of the governmental interest.

28. It is settled, for instance, "[T]hat an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the exercise of those freedoms." Shuttlesworth v. Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969).

free expression," and (3) the incidental restriction on alleged First Amendment rights is no greater than is essential to the furtherance of that interest.[29]

When we remanded this matter to the District Court for trial we instructed the judge to apply these guidelines to the facts as developed at trial. And it is in light of this balancing test that we must examine the findings and conclusions of the District Court.

4. Since the 1967 promulgation of the "Jett Memorandum," the Government has asserted a variety of interests to justify the permit regulation. Initially, in denying permits, the Government stated to unsuccessful applicants that the permit regulations were intended to preserve park values and to limit inconvenience to vehicular and pedestrian traffic. When the plaintiffs moved the district court for a preliminary injunction the Government adduced an additional justification, ". . . the interest of the security and safety of the Executive Residence, its occupants and contents . . ." (Bryant finding 13). A fourth interest asserted by the Government during the litigation has been a desire to prevent undue distraction of the considerable staff that works in the White House. In assessing the interests asserted by the Government in support of its permit system, Judge Hart made no express finding that any of the interests was "substantial," but he did find as follows:

> 22. The precautionary measures that may be used to protect the President in the White House may be such as to cover all reasonable contingencies, but they may not unduly and unnecessarily impinge on the Constitutional rights of the citizens, including those under the First Amendment. As applied here, the interests involved need to be balanced. The free expression of ideas must be balanced against the protection of the President and other public interests involved.

Implicit in this finding is a judgment that the interests advanced by the Government are "substantial" enough to be taken into account under the standards of the *O'Brien* formula. Balancing these asserted interests against First Amendment values, and measuring the Park Service's permit regulation as a means of striking the balance, Judge Hart concluded as a matter of law that the permit system on its face was a justifiable prior restraint on demonstration activity in the White House area, subject only to the different minimum numerical limitations prescribed in his conclusions.[30]

**29.** Jeannette Rankin Brigade, *supra* note 23, 342 F.Supp. at 584–585, *citing* United States v. O'Brien, supra note 27.

**30.** Judge Hart's conclusions were as follows:

1. The present 100/500 limitations on the number of demonstrators in front of the White House is more restrictive of First Amendment freedoms than is essential for the furtherance of the following governmental interests:
   a. Protection of the President and/or White House.
   b. Rights of citizens to use the sidewalks and the streets in front of the White House and Lafayette Park for the normal uses for which they are provided and maintained.
   c. Safety of citizens using facilities as in b. above.
   d. Safety of demonstrators.
   e. Ecology of Lafayette Park.
   f. Alternate locations for large protests.
2. Any limitations of less than 750/3000 would be more restrictive than is essential for the furtherance of governmental interests as set forth in 1. above.

* * * * * *

4. The permit requirement of 36 C.F.R. § 50.19 does not confer impermissibly broad discretion on government officials to grant or deny permits in violation of First Amendment rights except as set forth in conclusions 1. and 2. above, in this connection:
   a. The requirements of and standards for a permit or notice are reasonable.
   b. The restrictions on rush hour demonstrations are reasonable.
   c. The ban on the use of sound amplification systems on the White House sidewalk is reasonable.
   d. The requirement of marshals for simultaneous demonstrations in Lafayette Park and the White House sidewalk is reasonable.
   e. The ban on continuous demonstration lasting beyond 24 hours or beyond 7 consecutive days by one group is reasonable.

A Quaker Action Group v. Morton, Civil Action No. 688–69, 362 F.Supp. 1161 (D.D.C. 1973).

5. Accepting his implicit finding that the asserted governmental interests justify some prior restraint on First Amendment activity in the White House area, we affirm the District Judge's conclusions that the permit system, as written, is basically a constitutional prior restraint on First Amendment activity. In so holding, we are approving the overall permit system as being justified by the asserted governmental interests, and as being no more restrictive than necessary to preserve those interests.[31] At the same time, however, we disapprove some particulars of the regulation as needlessly vague or unacceptably restrictive of the First Amendment interests at stake. It is our view that such a course, which allows the continued existence of a regulation that appears necessary, but which focuses upon certain undesirable aspects of the regulation, is the most constructive approach to this delicate problem, avoiding the extremes of either an unqualified approval of the existing regulation, with its faults, or a total abrogation of that regulation.

Plaintiffs contend that the Government has failed to show any interest so compelling that it would justify the permit system, either absolutely or in preference to a notice system.

We do not consider this argument, or the plaintiffs' various criticisms of the regulation and its past administration—many of which we accept—to culminate in a determination that the entire regulation is unconstitutional. First, the security interest at stake in this litigation, no matter how ineptly presented by the Government, cannot be blinked. This interest alone justifies a prior restraint of some kind on public gatherings in the White House area. Second, since the White House area is a "unique situs" for demonstration activity, as the District Court found, there is a need for a governmental mechanism for allocating the scarce time and space resources of the White House area among competing applicants. A permit system allows such allocation while a notice would be inadequate for that purpose. We accord a different reception to other contentions of plaintiffs which challenge certain substantive and procedural provisions of the regulations as vague and overbroad, and criticize inadequacies in the regulation that have allowed alleged maladministration to take place in the past. Some of these criticisms are valid and we shall explore specific substantive and procedural aspects of the regulation, and prescribe certain necessary modifications. We are satisfied however that our overall approach is a sufficient answer to the plaintiffs' criticisms, and that if the regulation is appropriately modified it will meet constitutional standards.

In addition we wish to make clear to the Park Service that the premise of our holding is that the provisions of the permit system will be enforced uniformly and without discrimination and that there will be no deviation from the regulation's language that works an abridgment of communication by the applicant group.

31. In this regard, we note the difficulty of assessing whether an interest is "substantial" enough to justify compromising a First Amendment right. As Judge Wright stated:

> It is virtually impossible to derive principled answers to these [balancing] questions. The basic issue in all cases is how much the First Amendment requires society to give up in the interest of communication—that is, what price we are willing to put on free speech. In the long run, it will not do to say that we must pay a "substantial" price, since this answer does not tell us just how substantial the price must be. The *O'Brien* test works well at the extremes, but it may be that a new test will have to be devised for governing the close cases.

Women Strike II, *supra* note 23, 153 U.S.App. D.C. at 209, 472 F.2d at 1284. We would only observe that it is our view that the nature of the asserted governmental interests in this case do not render it sufficiently "close" that we need undertake a more rigorous scrutiny of the District Judge's conclusion that the First Amendment must be compromised in this situation.

B. *Substantive provisions in the permit regulation*

1. *Occasions requiring a permit.*

There are certain substantive provisions of the regulation that we do not disapprove in principle, but that we believe must be made more precise in order to minimize the possibility of any inadvertent or deliberate abuse of official discretion. In particular we are concerned about the following provision:

"[p]ublic gatherings, other than NPS events, may be held only pursuant to a valid official permit issued in accordance with the provisions of this section." [32]

This provision raises two problems, one being the appropriate definition of a "public gathering," the other concerning the "NPS event" concept.

(a) *Definition of "public gathering" for enforcement purposes.*

The regulations define a "public gathering" as including, but not limited to, "demonstrations, picketing, speechmaking, holding of vigils, parades, ceremonies, meetings, entertainment and all other forms of public assembly." [33] Assuming the validity of the permit regulation, we see no constitutional objection to this definition, which in no way discriminates against First Amendment activity. The problem is that the Park Service may have defined "public gathering" for enforcement purposes to mean only those public gatherings with expressive content. We inquired on this point at oral argument. Government counsel then took the position that a "public gathering" would be any group in which at least one person carried a sign or engaged in First Amendment activity. By contrast, counsel noted that a group of persons in the White House area would not be considered a "public gathering" if there were no manifestation of such expressive activity. Further, Government counsel put it that even a single individual constituted a "public gathering" by taking up a sign and marching in behalf of some cause. This result is absurd and it demonstrates the aridity of the Government's approach. Accordingly, we sustain the validity of the permit system on the assumption—which can be enforced judicially if need be—that the Park Service will issue an implementing regulation defining "public gathering" in terms that do not impermissibly discriminate against First Amendment activity, *e. g.*, whether a person has a sign, or whether the sign has an acceptable message. The Park Service may wish to avoid unwieldy administrative burdens by exemptions from the permit requirement, *e. g.*, groups of less than a specified size.

(b) *Designation of "NPS events".*

The second problem with the "public gathering" provision involves the exemption from the permit requirement granted to "NPS events." These events are defined as "any celebration, commemorative, or recreational event sponsored or co-sponsored by the National Park Service." [34] We are troubled by the lack of any expressed standards for selection of "NPS events," and by the total absence of an announced procedure for such selection. In view of the Park Service's record in this and other cases, the lack of standards and procedures gives rise to the concern that the Park Service may discriminate against First Amendment activity by selective granting or withholding of "NPS event" status and of the accompanying exemption from the ordinary permit requirements. In a previous litigation, the Park Service tried to limit certain protest activities because of conflict with an "NPS event" which was not without political overtones.[35] There was a lack of any announced standards for selection of "NPS events":

> . . . we are left without a coherent framework of regulations, govern-

32. 36 C.F.R. § 50.19(b) (1973), set forth in the Appendix.

33. 36 C.F.R. § 50.19(a)(1) (1973), set forth in the Appendix.

34. 36 C.F.R. § 50.19(a)(5) (1973), set forth in the Appendix.

35. Women Strike II, *supra* note 23.

ing public gatherings in park areas subject to the jurisdiction of the National Park Service based on thorough and reflective consideration of park values, including First Amendment rights. The Department of the Interior has not shouldered the responsibility to provide discriminating, rather than discriminatory, park regulations. A forthcoming and careful exercise of administrative responsibility may serve to avoid administrative disarray.[36]

The Park Service, however, has let its regulations stand unchanged, in any material way, and there have been no procedures for refining responsibility.

In the future, if the Park Service wishes to enforce the regulations requiring a permit for public gatherings in the regulated areas, it must require a permit for *every* public gathering in those areas. We see no burden on the Park Service as to what it now treats as an "NPS event"—it can simply issue a permit for such an event. If it wishes to issue a permit for, say, more than 3,000 persons in Lafayette Park, it can do so by incorporating in its regulations a provision for waiver of that numerical limit, with appropriate standards—and all applicants will in the future at least have opportunity to submit for consideration a petition to waive that limit. Or, if the Park Service wishes, it could retain a system of "NPS events," reserve time in, say, Lafayette Park, and even publish advance schedules. This could be done, for instance, by establishing in advance an announced schedule of recurrent annual events.

2. *Grounds for permit denial.*

Plaintiffs challenge as vague and overbroad the regulation's provision that a permit may be denied if "[i]t reasonably appears that the proposed public gathering will present a clear and present danger to the public safety, good order, or health . . ."[37] In particular, plaintiffs argue that this wording allows Park Service officials to refuse permits on the basis of the ideological position of the applicant group, in effect to equate "leftist tendencies" with an unacceptable tendency to violence. It would be impermissible to grant or deny a permit merely on the basis of the content of the views to be expressed in the demonstration, assuming no violation of law appears in a mixture of speech and conduct.

Given the uniqueness and importance of the security interest of protection of the White House as justifying a greater limitation than would be applicable generally to use of public streets and parks, we conclude that the Constitution is not offended by the standard in the regulation, limited as it is (1) to the presence of a clear and present danger, that is (2) confined to the need to protect public safety and public health (including in public safety the avoidance of disorder). This is not like the ordinance held invalid in Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) which authorized members of a city commission to deny a permit if "in its judgment the public welfare, peace, safety, health, decency, good order, morals, or convenience require that it be refused." The Court held that this gave the commission "virtually unbridled and absolute power" to prohibit a demonstration on the city's ways. (394 U.S. at 150, 89 S.Ct. 935.) The regulations before us do not extend to categories as amorphous as welfare, decency and convenience. And they do not define the granting of the permit in terms of the subjective judgment of the officials. The regulations before us are defined in terms of substantive criteria and the courts are open in the event of maladministration to hear concrete evidence in support of such a complaint. See Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951); Quak-

36. *Id.*, 153 U.S.App.D.C. at 228, 472 F.2d at 1303 (opinion of Judge Leventhal in support of result in which Judge Robb concurs).

37. 36 C.F.R. § 50.19(f)(2) (1973), set forth in the Appendix.

er Action Group v. Hickel, cited *supra* note 12.[38]

3. *Numerical Restrictions.*

We turn to the Park Service's program to restrict the number of persons able to participate in a public gathering in the White House area.[39] The question we face is how to balance the First Amendment interest against the asserted security justification, because none of the other interests that would justify some limitation of crowd size, *i. e.*, physical space, park values, pedestrian and vehicular traffic, can seriously be advanced in behalf of so stringent a limitation as is contained in the regulation.

The record is inconclusive as to the relationship between the size of a public gathering and the threat that gathering might pose to White House security. The testimony by the Secret Service and other security officials may be summarized as follows: (1) It is their belief that any demonstration, especially a large one, would pose an unreasonable danger to the security of the President and of the White House.[40] (2) There has never been a demonstration, including the quite large ones, that actually posed a security threat to the White House or to the President. (3) There has never been a demonstration about which the police and other authorities lacked adequate information obtained from sources independent of any permit and notice machinery.[41] Although the Government made strenuous attempts to have the court rely upon an asserted "potential for violence disorder"[42] and upon the alleged instances of "violent demonstration conduct, and other violent or bizarre conduct, in Washington, D.C. and across the Nation . . .,"[43] Judge Hart found that arrests were made for disorderly conduct in only five of the 383 then most recent demonstrations in the White House area (including some 77 demonstrations in excess of the 100/500 limitations), while violent incidents were reported in only six demonstrations (three in large demonstrations, and three in small ones).[44] The record also contains expert testimony that as crowds grow larger they become more docile and less prone to violence and that there is no

38. The maladministration that Judge Bryant found had existed in the pre 1969 era, findings in due course accepted by Judge Hart, turned on manipulation of procedural requirements. The possibility of such abuse has been minimized if not completely obviated by our ruling on the procedural provisions of the regulations.

39. The numerical limitation is found at 36 C.F.R. § 50.19(g)(2) and (3) (1973), set forth in the Appendix.

40. For instance, in a "Position Paper" dated July 24, 1967, the Secret Service stated its strong belief:

> that the continuation of picketing and demonstrating by protest groups in front of the White House constitutes a threat to the safety of the President of the United States and that this activity should not be permitted.

(Plaintiff's exhibit 18, Pl.A. at Tab 23). Of course it is understandable that those charged with Presidential safety would prefer, as Judge Hart put it, to take "the precautions of a dictator" to shield him (or the White House complex) from danger. (Finding 23), A Quaker Action Group v. Morton, Civil Action No. 688–69, 362 F.Supp. 1161 (D.D.C.1973). This, of course, is simply not possible in a democracy, for the President cannot be kept in a steel room away from the public. We would observe, however, that the President probably faces far fewer risks from even the largest demonstration at the White House than when he moves in a parade or visits a baseball stadium or makes any sort of public appearance. This observation is supported by testimony from the Assistant Director for Protective Intelligence for the Secret Service, who rated the White House as virtually the safest place for the President. (Tr. at 164).

41. Finding 19 states as follows:

> The White House sidewalk and Lafayette Park have a history of demonstrations. None of these demonstrations in the judgment of the Director of the Secret Service, up to this time, has posed a serious threat to the security of the President in the White House.

A Quaker Action Group v. Morton, Civil Action No. 688–69, 362 F.Supp. 1161 (D.D.C. 1973).

42. Government's brief at 18.

43. *Id.*

44. Finding 20, A Quaker Action Group v. Morton, Civil Action No. 688–69, 362 F.Supp. 1161 (D.D.C.1973).

causal relationship between a crowd's size and the threat it might pose to White House security.

This record evidence is helpful, but not dispositive. Thus the testimony of the Government's witnesses, while credible on the general issue whether exposure of the President to the public poses a security threat, has less relevance to the relationship between variations in a crowd's size and in its danger to the President. Moreover, the testimony is considerably weakened by the officials' admission as to the lack of risk presented by past demonstrations and by Judge Hart's findings as to those demonstrations.

On the other hand, as Judge Hart recognized, it cannot be denied that a public gathering presents some measure of hazard to the security of the President and the White House. Common sense mandates caution in this matter and the fact that no demonstration in the past has been a hazard is not decisive. As Judge Hart states, "[n]o President was ever killed in a theater until Lincoln, in a railway station until Garfield, in a reception line until McKinley, or in an open car until Kennedy." His statement reflects the doubt that any judge feels when confronted by an interest so compelling as Presidental safety. It would have been helpful if the Government had really proved a case, but its failure to do so does not give us license to ignore potential risks to the President.

Nor can we soothe our troublesome doubt by applying the balm of the expert testimony offered by plaintiffs' distinguished witness. While this testimony is responsible, and perhaps highly predictive of crowd behavior, we are loath to override a concern for Presidential safety by reliance on the conclusions of a single expert witness. As was stated in a closely analogous context,

> [such] testimony must be taken as enhancing insight, not controlling outcome. Insofar as it brings forward relevant principles . . . it is useful. * * *
>
> [But it] would require stronger proof than this . . . to override what . . . are the dictates of common sense.[45]

The Court's predicament in the balancing process in the First Amendment area was captured by one commentator:

> [The process depends], to an inordinate extent, on predictions of behavior—predictions unsubstantiated by survey data or "interdisciplinary" documentation. As is true in almost every modern problem area, the issues that arise out of mass demonstrations must, of necessity, be resolved without the benefit of empirical knowledge. Until that situation is corrected, the choice is between careful guesswork and analytic paralysis.[46]

Because the record does not resolve our dilemma, the court must proceed by "careful guesswork" to a resolution of the instant issue, studying the materials at hand, and also factoring in "common sense," even if that rests on a base of intuitive perceptions.

As a starting point, we affirm Judge Hart's conclusion that "[a]ny limitation of less than 750/3,000 would be more restrictive than is essential for the furtherance of [the asserted] governmental interests . . ."[47] As already seen, this conclusion rests upon extensive findings rooted in the history of demonstrations in the White House area, as well as upon an assessment of the testimony given in the courtroom by the Government's security experts. Moreover, it is not without significance that the conclusion that 750/3000 is a minimum acceptable limitation was reached after trial by the same judge who had

45. Women Strike II, *supra* note 23, 153 U.S.App.D.C. at 227–228, 472 F.2d at 1302–1303 (opinion of Judge Leventhal).

46. Blasi, Prior Restraints on Demonstrations, 68 Mich.L.Rev. 1481, 1574 (1970).

47. Conclusion 2, A Quaker Action Group v. Morton, Civil Action No. 688–69, 362 F.Supp. 1161 (D.D.C.1973).

granted summary judgment to the Government when he read the affidavits, before he pondered the testimony given in open court.

The 750/3000 limitation figure, developed by the District Court as a minimum limitation, provides a reasonably firm basis for projecting that a limitation in this modest range will not mean substantial security problems. Underlying this conclusion are the availability of police restrictions on any particular crowd that proves to be unruly or dangerous; and the capability of the Washington, D.C. police to become informed concerning the shape and characteristics of demonstrations.

Plaintiffs object that there is nothing in the record to support a limitation of 750/3000—or indeed any limitation at all. But Judge Hart's figures reflect his finding that only 9 out of 154 demonstrations in the most active demonstration years, from 1965 to 1972, exceeded the 750/3000 figures.[48] Judge Hart's figures thus establish the likelihood that 90% of proposed public gatherings would meet the size limitation requirement. In a case which turns on efforts to coordinate security with minimum restriction on right of assembly, this fact points the way to a common-sensical path and a sound judicial goal.

Moreover, Judge Hart stated his conclusion in a manner that renders his prescribed figures a *minimum* limitation. We affirm his conclusion as such. He did not establish the figures to become maximum restrictions. Nevertheless, after the appeal was taken, and the case was lodged in the jurisdiction of this court, the Park Service promulgated a regulation setting the 750/3000 figures as a maximum limitation. We see problems in this regulation, which was not mandated by the District Court's order. We see problems particularly in the 3,000 figure for Lafayette Park—assuming, as we have reason to believe to be the case, that the Park Service would tolerate public gatherings in Lafayette Park above 3,000 in an "NPS event" context. Thus, the balancing process may come to tolerate larger figures than 3,000 for Lafayette Park, even should a 750 figure be sustained for the White House sidewalk. This would permit large gatherings in exercise of the right of assembly, with rotation of members to the White House sidewalk, but with a limitation of the number concentrated there at any one time; and it would permit barriers between Lafayette Park and the White House sidewalk to reduce possible dangers. Such barriers, mobil, flexible, and without an intrusive appearance, have been found useful for the purpose. Other alternatives are possible.

We could remand for District Court consideration of the new regulation, consideration that would be aided by our action in upholding the validity of the permit system generally, and our approval of Judge Hart's ruling on the 750/3000 figures as a minimum limitation. But in the interest of justice, 28 U.S.C. § 2106, of the eventual end of litigation, we think it appropriate to go further and say that in our view the record before us does not justify an absolute limitation, in anything like the 3,000 range, that was promulgated by the Park Service after the District Court decision. The regulation could be upheld, if at all, only if there were provision for waiver of such a limit, under appropriate standards whereby applicants could show that a proposed demonstration had been planned and would be patroled in such fashion as to render unlikely any substantial risk to the occupants or officers of the White House or adjoining office buildings.[49]

48. Finding 20, *Id.*

49. The provision in the Park Service regulation requiring Marshalls for large demonstrations is plainly reasonable, for instance. And compliance with this or like requirements would presumably be part of the showing in any waiver request. The Park Service could also require more information for waiver requests than for ordinary permit applications, including capability of the sponsors to establish crowd control techniques, supply emergency aid and facilities.

Thus it is our view that the Park Service cannot maintain in effect a regulation that rigidly and absolutely precludes all demonstrations merely because the number projected for Lafayette Park exceeds 3,000. We do not say that there can be no numerical limit for Lafayette Park demonstrations. Considerations like physical space or protection of shrubs would permit such a limit, but the figures based on such grounds, according to the record, would run in the neighborhood of 40,000 to 50,000 and would have no significance for the realities of the problems under discussion. In issuing permits for assemblies up to 3,000, and in considering applications above that figure, the Park Service will have to undertake a more reflective and coherent approach.

We interject to take note of a point pressed at oral argument by Government counsel's asking: Why can't applicants hold their demonstrations on the Ellipse, with the speakers framed against the rear of the White House? The answer is that there are unique First Amendment values in use of the White House sidewalk;[49a] and citizens seeking redress of grievances are not unreasonable if they propose to come to the front of the House rather than be shunted to the back door. Of course there may come a time when the crowd is so huge that it is reasonable to insist that all facilities be used. Just as Lafayette Park may be a holding pattern for smaller groups which go to the White House sidewalk, so it may be reasonable, in case of huge demonstrations, to use the Ellipse for overflow and a holding pattern.

We have expressed the conclusion that the record, with the aid of common sense perceptions, provides more warrant for a limitation of 750 for the White House sidewalk, as a minimum ceiling, than for a limitation of 3,000 for Lafayette Park. We envisage, however, that once a waiver procedure is evolved, for numbers in Lafayette Park, it should be extended to the use of the White House sidewalk by groups over 750 in number. Such a flexible approach would be in keeping with our view of the case and of the Park Service's responsibilities.

4. *Miscellaneous substantive provisions of the permit regulation.*

In addition to the provisions already discussed, there are several other substantive provisions of the permit regulation that the plaintiffs have challenged.

(a) *Rush hour demonstrations*: The regulation prohibits public gatherings during morning and evening rush hours.[50] Plaintiffs challenge this restriction on the basis of expert evidence to the effect that demonstrations in Lafayette Park and on the White House sidewalk cause no interference with traffic. Although the Government apparently made no effort either to rebut plaintiff's evidence or to introduce other evidence to the contrary, the District Judge found this requirement was "reasonable."[51] While the record does not present much support specifically addressed to this requirement we are inclined to defer to the conclusion of the District Court. We have in mind the common-sense appeal of the restriction, and the need for balancing the consideration that the rush hour prohibition does not apply on weekends, when most large demonstrations occur. We would also note that the Park Service may establish a means for

49a. The Government argues that restrictions on communications may be upheld "in light of the alternative means of communication permitted," citing *e. g.*, Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). However, we cannot ignore the unique quality of demonstrations in front of the White House from the viewpoint of First Amendment intersts. That unique symbolism may well account for the fact that the Government has never proposed a complete ban on such demonstrations, the only absolutely riskless way of avoiding all conceivable danger to the White House from such demonstrations.

50. 36 C.F.R. § 50.19(g)(6) (1973), set forth in the Appendix.

51. Conclusion 4b, A Quaker Action Group v. Morton, Civil Action No. 688–69, 362 F.Supp. 1161 (D.D.C.1973).

waiver of this requirement, especially for small demonstrations.

(b) *Sound amplification equipment*: Plaintiffs protest the regulation's prohibition against the use of sound amplification equipment on the White House sidewalk, except in connection with crowd control.[52] There is ample justification in the Government's legitimate asserted interest in keeping the White House staff free of undue distractions from their work. There is implied authorization for sound amplification in Lafayette Park. There is adequate provision for First Amendment communication. We affirm the trial judge's approval of this restriction.

(c) *Limitation on demonstration location*: The regulation further provides that no "permit will be issued for any place within the White House area, except for the White House sidewalk, Lafayette Park and the Ellipse." [53] Once again, the record is devoid of any particular justification for this prohibition. The District Judge has not commented on this requirement. Possibly there is a problem with dispersal of demonstrators in these other areas. In any event, the regulation allows public gatherings to be held in what must be conceded are the crucial areas from a First Amendment viewpoint. This case really developed in the context of demonstrations on the White House sidewalk and in Lafayette Park, and if there genuinely is a problem as to other White House areas we think it should be focused in separate and supplemental litigation. It is sound judicial administration to focus on the core of the controversy, and remit the dispositon of details and minor issues to subsequent consideration, which will be aided by the content and implementation of the primary decision.[54]

(d) *Duration*: The regulation prohibits the issuance of a permit "for a period of more than seven consecutive days . . . " or for any public gathering "having a duration of more than 24 consecutive hours." [55] The asserted justification for this requirement is that it allows maximum allocation of the scarce space involved, an interest entitled to some weight. But accommodation of that interest does not require *per se* disallowance of lengthy demonstrations. If a particular application contemplates a demonstration of such extended duration as to preclude a competing application, the Park Service may condition the grant of the permit on an appropriate limitation of the demonstration's length. The Government regulations could provide that any permit for a period beyond a specified limit is subject to displacement if others seek a permit that precludes double occupancy. In view of the availability of less restrictive methods to achieve the same end, this part of the existing regulation must be held invalid.

## B. *Procedural aspects of the regulations*

Although we are affirming Judge Hart's determination that an overall permit system is not *per se* in an unconstitutional imbalance with First Amendment activity in the White House area, certain procedural inadequacies of the existing permit regulation must be corrected. The 1969 findings of maladministration made by Judge Bryant in support of the preliminary injunction,[56] and

52. 36 C.F.R. § 50.19(d)(2) (1973), set forth in the Appendix.

53. 36 C.F.R. § 50.19(g)(1) (1973), set forth in the Appendix.

54. Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1359–1360, 20 L.Ed.2d 312, 335–336 (1968); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395–397, 47 S.Ct. 114, 121, 71 L.Ed. 303, 314–315 (1926).

55. 36 C.F.R. § 50.19(g)(5) (1973), set forth in the Appendix.

56. An example of the type of harassment that cannot be tolerated in the future may be found in Judge Bryant's 1969 findings:

> 14(g) In the course of enforcing 36 C.F.R. § 50.19 (1968), the defendants have frequently required applicants, among them the plaintiffs, to travel several times to the Office of the National Capital Region to furnish detailed information of questionable relevance before rendering a decision upon an application. The Office of the National Capital Region is in an out-of-the-way

continuing complaints that the issuance of permits has been unnecessarily delayed or that applicants are being harassed by officials, make it appropriate to insist on more formal procedures governing the timing of permit application and consideration.

1. As a starting point, we approve the existing provision requiring applicants to apply for a permit at least 48 hours in advance of a planned public gathering.[57] This provides the Park Service ample notice and time to process the application.

We note, however, that the regulations contain no deadline for administrative action by the Park Service. We believe such a deadline is an essential feature of a permit system.[58] In principle, an applicant would seem entitled to notice of a proposed denial of his permit within 24 hours after submission of the application.[59]

If there is disagreement on this point, the parties may apply to the District Court to formulate a different deadline. In view of the interests at stake, however, and of the possibility of procedural abuse, we conclude that the Park Service must revise the regulation to provide explicitly that a permit application not acted upon when the administrative deadline has expired is to be deemed granted.

Should the Park Service discover information leading it to the reasonable belief that a planned public gathering for which it has issued or been deemed to have issued a permit will pose a serious security threat to the President or the White House, it may exercise an emergency right to withdraw its previously given approval. But in accordance with our view of the permit regulation, such emergency withdrawal should be the subject of express standards formulated to provide for principled consideration by an official of responsible rank and function, and should be exercised only in accordance with those standards.

Finally, this opinion does not preclude the Park Service from abandoning the permit regulation in favor of a reasonable notice system—provided such system meets guidelines discussed in this opinion. Or the Government may decide to rely on contemporaneous police control to assure order, without the addition of a prior restraint system. We interpolate at this juncture a point that has broken to the surface in this case, but was not explored in depth. In the event of any ongoing consideration of this regulation, administrative as well as judicial, the question may fairly be put: Why not use straightforward strengthening of the fence as a technique for enhancing Presidential security? Up to now, the Park Service seems to have blunted the in-

place; such travels thus work substantial hardships upon applicants. For example, during July and August of 1968, one permit applicant was forced to make 13 separate trips to the Office of the National Capital Region within a period of 4 weeks to obtain demonstration permits for a few persons to assemble on the White House sidewalk; on one occasion the permit was delayed several days so that the occasion for the demonstration had passed when the permit was finally granted.

A Quaker Action Group v. Hickel, Civil Action No. 688–69 (D.D.C.April 25, 1969).

The need for procedures to help assure against any recurrence of maladministration is not obviated by Judge Hart's finding (par.29): "There has been no material abuse of the administration of the permit system since April 24, 1969." This was a period governed not only by Judge Bryant's preliminary injunction issued April 26, 1969, but by unusual attention to the situation on the part of the office of United States Attorney's staff, the District Court and this court.

57. 36 C.F.R. § 50.19(e)(1), set forth in the Appendix.

58. *See generally* Blasi, *supra* note 46 at 1539–45.

59. Support for the reasonableness of this requirement may be found in Plaintiff's Exhibit 232 (Pl.A. Tab 46) in which the Superintendent of the National Capital Parks-Central states:

> . . . I believe it would be desirable to establish an administrative policy requiring a reasonable period of time for issuance of these permits, if needed. I recommend a reasonable length of time be defined as six hours . . .

quiry with the comment that this lies within the domain of the Secret Service. But surely this is a matter on which the government entire is involved, and the two departments should be coordinated. Government counsel in this proceeding have met the question by emphasizing the need for a low profile and aversion to a garrison state. That seems hyperbolic, like the public outcry when a White House fence was first put up, in Theodore Roosevelt's time. At any rate, possibilities remain to be explored, like the use of stronger materials, for achieving a barrier that combines increased security with an acceptably open aspect. This may be of significant value in approaching the ultimate objective of combining presidential security with minimum infringement of First Amendment interests. Short of this, the Government may develop innovations designed to retain a permit system yet minimize administrative burdens. For instance, the Park Service may find it convenient to exempt all groups of a certain size from any requirements at all, to make groups of another size subject only to a notice requirement, or to apply the permit requirement only to large groups. While the foregoing observations are not strictly necessary to our decision, if courts are called on to consider a complex of legal issues, as we have been in these cases for some five years, it seems appropriate to venture a few comments that may possibly avoid future strains.

## CONCLUSION

This litigation has called on the courts to exercise a searching and sensitive obligation, to reconcile First Amendment values and the public interest in the security of the White House.

Fortunately, this court has had the benefit of the District Court's opinion and order. Its basic and critical rulings recognize that the White House sidewalk and Lafayette Park are "a unique situs for the exercise of First Amendment rights", and that any limitation of crowd size of less than 750 for the sidewalk, and less than 3,000 for Lafayette Park

"would be more restrictive than is essential for the furtherance of governmental interests." We have in general affirmed the District Court's order as a fair balance of First Amendment and security interests. The District Court heard the testimony tendered by both citizens and government, including the cross-examination of government officials and expert witnesses. We find the basic determinations of the District Court to be supported by the record testimony as supplemented by common sense judicial perceptions. In the same vein, we have sustained the District Court's ruling upholding the continuance of a permit system.

In certain aspects, our judgment contemplates some modification or supplementing of the District Court's judgment. Thus, the District Court order only provided that 3,000 was the minimum figure that could be set as a limit on public gatherings in Lafayette Park. The subsequent regulation of the Park Service establishing this 3,000 figure as an absolute limitation is not required by the District Court ruling, and it is not, in our view, sustainable on the record. As to this aspect of the case our order contemplates that the regulation setting 3,000 as a limit on public gatherings in Lafayette Park is sustainable only if it is supplemented by a provision that permits waiver of this numerical limitation on an appropriate showing by an applicant. Although we have upheld the permit system, we have also required the Park Service to publish precise regulations defining "public gathering" by distinctions which turn on security criteria rather than free speech criteria, and describing the specific implementing standards for denial of an individual permit.

We have ruled that a permit must be deemed granted unless denied within a stated time (24 hours, unless the district court specifies another period). If the NPS does discover that a particular gathering will be a threat to security, it can withdraw the permit, but the NPS must act according to express standards. Our ruling also calls on the NPS to re-

vise its regulation defining an NPS event and require permits for all NPS events. No longer will the Park Service be able to limit the use of the area to seven consecutive days, though it of course has authority to deny a permit or its extension when there are competing applicants for the same place and time.

To the extent that reliable security can be obtained with stronger fences, greater surveillance, and increased co-ordination with the District of Columbia police force, there is no reason why it should be obtained through limitations on liberty of speech and assembly. It is our contemplation that the Park Service will take a hard look at its own procedures to insure the viability of the First Amendment in its park domain.[60]

The judgment of the District Court is affirmed in part. In part the case is remanded so that the District Court may re-fashion its mandate in a manner not inconsistent with our opinion.

So ordered.

APPENDIX

The regulation at 36 C.F.R. § 50.19 (1973), see footnote 5 of opinion, contains the following provisions:

§ *50.19 Public gatherings.*

(a) Definitions:

(1) The term "public gatherings" includes, but is not limited to, demonstrations, picketing, speechmaking, holding of vigils, parades, ceremonies, meetings, entertainment and all other forms of public assembly.

(2) The term "White House area" means all park areas, including sidewalks adjacent thereto, within these bounds: on the south, Constitution Avenue N.W.; on the north, H Street N.W.; on the east, 15th Street N.W.; and on the west, 17th Street N.W.

(3) The term "White House sidewalk" means the south sidewalk of Pennsylvania Avenue N.W., between East and West Executive Avenues N.W.

(4) The term "park areas" shall include all areas, including sidewalks adjacent thereto, other than the White House area, administered by National Capital Parks of the National Park Service.

(5) The term "NPS event" means any celebration, commemorative, or recreational event sponsored or co-sponsored by the National Park Service.

(b) Public gatherings, other than NPS events, may be held only pursuant to a valid official permit issued in accordance with the provisions of this section. NPS events are excepted from the operation of this section. They will not require official permits; may be held in any park area or the White House area; and may preempt any such areas to the exclusion of other public gatherings.

(c) Speaker's stands or platforms may be erected, where needed, as adjuncts to any permitted public gathering, except on the White House sidewalk; but no other structures (including billboards, displays, etc.) may be erected on park lands except in connection with NPS events. All such structures shall be erected as inconspicuously as possible, and with least possible damage to basic National Park System values, and shall be dismantled as soon as practicable after conclusion of the public gathering.

(d) In connection with permitted public gatherings, except on the White House sidewalk, movable facilities—such as stands, lecterns, sound amplification equipment, chairs, portable sanitary facilities, and press and news facilities—reasonably necessary as an integral part of a public gathering, shall be permitted,

60. We are concerned with the possibility that this drawn out litigation has, to this point, reflected an insensitivity on the part of the Park Service to the consideration that there are "park values" in the use of these parks for speech and demonstrations. It is our contemplation that the Park Service will evolve coherent policies reflecting the concerns identified in this opinion, and thereby obviate the continual involvement of the courts in what should be essentially matters of park administration and local police responsibility.

provided prior notice has been given to the Superintendent, except that:

(1) The Superintendent reserves the right to limit the sound amplification equipment, so that it will not unreasonably disturb nonparticipating persons in, or in the vicinity of, the area.

(2) No sound amplification equipment shall be used on the White House sidewalk, other than hand-portable sound amplification equipment which the Superintendent determines, in the exercise of his judgment, is necessary for crowd control purposes.

(3) The Superintendent may impose reasonable restrictions upon the moveable facilities permitted, in the interest of protecting the park area involved for the primary park purpose to which it has been dedicated, traffic considerations, and other legitimate park value concerns.

(e) Permit applications shall be submitted to the General Superintendent, National Capital Parks, National Park Service, 110 Ohio Drive, S.W., Washington, D.C. 20243:

(1) White House Area: Permit applications shall be submitted in writing on a form provided by National Park Service so as to be received by the Superintendent at least 48 hours in advance of any proposed public gathering.

(2) Park Areas: Permit applications for all park areas, except the White House area, shall provide the following information: Area, date, time, duration, and nature of the public gathering; estimated number of participants; sponsoring organization; props and equipment to be used; and name, address, and phone number of applicant.

(f) The Superintendent shall process with reasonable promptness applications in order of receipt; and, subject to the limitations set forth in the next following subsection, he shall issue an official permit upon proper application, authorizing a peaceable and orderly public gathering to be held, unless:

(1) A proper prior application for the same time and place has been received, and has been or will be granted on an "exclusive" use basis; or

(2) It reasonably appears that the proposed public gathering will present a clear and present danger to the public safety, good order, or health; or

(3) The proposed public gathering is of such a nature or duration that it cannot reasonably be accommodated in the particular area applied for; in that event, an alternate site if available for the activity shall be proposed by the Superintendent to the applicant; in this connection, the Superintendent shall reasonably take into account possible damage to the park including trees, shrubbery, other plantings, park installations and statues.

(4) The permit is subject to denial as contrary to any of the provisions in this section.

(g) Issuance of permits under paragraph (f) of this section shall be subject to the following limitations:

(1) No permit shall be issued for any place within the White House area, except for the White House sidewalk, Lafayette Park, and the Ellipse.

(2) No more than 100 persons shall be permitted to conduct a public gathering on the White House sidewalk at any one time.

(3) No more than 500 persons shall be permitted to conduct a public gathering at Lafayette Park at any one time.

(4) No permit shall be issued to an organization, group, or other sponsor to conduct public gathering activities on the White House sidewalk and in Lafayette Park at the same time, except under the following conditions:

(i) Any overage above subparagraphs (2) and (3) of this paragraph shall proceed to the Ellipse via 15th Street and/or 17th Street (or shall proceed to some other agreed-upon designated park site) and shall there conduct public gathering activities; and

(ii) The organization, group, or other sponsor of such public gathering activities shall undertake in good faith all reasonable action—including the provision of sufficient marshals—to insure good

order and self-discipline in carrying on such public gathering activities, including any necessary movements of persons, so that the numerical limitations prescribed under subparagraphs (2) and (3) of this paragraph shall be observed at all times on the White House sidewalk and in Lafayette Park.

(5) No permit shall be issued for a period of more than 7 consecutive days, and no permit shall authorize any public gathering having a duration of more than 24 consecutive hours.

(6) No public gatherings shall be permitted to be held between the hours of 7:00–9:30 a.m. and 4:00–6:30 p.m., except on Saturdays, Sundays, and legal holidays, unless it shall be made to appear to the satisfaction of the Superintendent that the holding of the particular public gathering will not unreasonably interfere with rush-hour traffic.

(h) Authorized permits may contain additional reasonable conditions and additional time limitations, consistent with this regulation, in the interest of protecting the park site involved for the primary park purpose to which it has been dedicated, the use of nearby areas by other persons, and other legitimate park value concerns.

(i) Public gatherings may be held and speeches may be made in the following areas under the jurisdiction of the National Capital Parks without official permit. The conduct of any such gathering shall be reasonably consistent with the protection and use of the area for the purposes for which it is maintained:

(1) *Franklin Park.* Thirteenth Street, between I and K Streets N.W., for no more than 500 persons.

(2) *McPherson Square.* Fifteenth Street, between I and K Streets N.W., for no more than 500 persons.

(3) *U.S. Reservation No. 31.* West of 18th Street and south of H Street N.W., for no more than 100 persons.

(4) *Rock Creek and Potomac Parkway.* West of 23d Street, south of P Street N.W., for no more than 1,000 persons.

(5) *Garfield Park.* East side of Second Street S.E., between Virginia Avenue and South Carolina Avenue, for no more than 1,000 persons.

(6) *U.S. Reservation No. 46.* North side of Pennsylvania Avenue, west of Eighth Street and south of D Street S.E., for no more than 25 persons.

[35 F.R. 15393, Oct. 2, 1970, as amended at 37 F.R. 24900, Nov. 22, 1972]

Note: The effective date of the amendments at 35 F.R. 15393, Oct. 2, 1970 and 37 F.R. 24900, Nov. 22, 1972 have been postponed pending court action. See 35 F.R. 17552, Nov. 14, 1970.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

While I concur in much of the foregoing opinion, I do have some disagreement with several of its findings and directions. We are here dealing with the use of the White House and its environs, and as the record states:

> A. Well, aside from the White House being the residence of the President, it is of course also his office both at the White House and in the complex next to the White House and the Executive Office Building.
>
> The White House is a center of a tremendously important * * * defense communications system, since the President is the Commander in Chief of the military forces.
>
> It is the seat of the National Security Council; it has extremely important papers, documents; [and] it is, of course, also, a national shrine and museum, a piece of property that is very important to the American People.
>
> [Tr. 106] The Secret Service has the responsibility of protecting the President. It also under Section 202 of Title 3 [, United States Code,] has the responsibility for protecting the White House and the [White House] grounds through the use of the Executive Protective Service, formerly the White House Police.

G.A. IIIA, 274–75.[1] It is also common knowledge that the White House contains the "Hot Line" to the Kremlin, which is a vital factor in our national security.

I .

At the outset I concur in the majority's conclusion that the present definition of the term "public gathering" is constitutionally valid, Majority Op. at 728, but I disagree with the inferences which the majority apparently intends should be drawn from its discussion of the application of the definition. Without explicitly so holding, it appears that the majority intends its opinion to be interpreted to eliminate the possibility that the regulation could be applied only to individuals or groups who plan to engage in conduct normally associated with First Amendment activity and also intends to prevent its application to individual demonstrators entirely. While the language of the regulation does not on its face require the pattern of enforcement which the majority fears, counsel for the Government did assert that it would be so applied. Assuming that the permit requirement would be imposed on individuals or small groups as well as larger demonstrations and assuming that it would be applied only to those individuals or groups that engage in conduct which is commonly associated with expression, I do not find that such a regulation would necessarily be unconstitutional.

In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court stated:

> This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.

*Id.* at 376, 88 S.Ct. at 1678–1679. The validity of the regulation thus depends on the presence of "nonspeech" conduct which the Government has a legitimate interest in regulating. By holding that the permit system is a constitutional prior restraint on First Amendment activity, the majority has of necessity found that certain elements of the conduct of a "public gathering" are properly within the scope of government regulation. However, when the Government chooses to regulate certain conduct on the White House sidewalk and in Lafayette Park, it is certainly not required to regulate all conduct by all persons who may happen to enter that area and technically fall within the definition of a "public gathering," so long as distinctions are not made on an improper basis.

It is a perfectly reasonable classification to exclude from the permit requirement those individuals and groups who use the White House sidewalk and Lafayette Park for non-assertive conduct, such as tourists or normal pedestrians, while requiring individuals and groups who use the area for combined speech and nonspeech conduct to notify the authorities of their intended use and obtain a permit under the applicable constitutional standards. There may well be other aggregations of people which are technically "public gatherings" but which do not pose a security threat or interfere with the other interests protected by the regulation.[2] Where no governmental interests are threatened, it would certainly be reasonable for the National Park Service to adopt regulations exempting such activities. However, the majority's proposal for a minimum size limit on the permit requirement is not supported by any evidence that smaller "public gatherings" do not engage in conduct which is properly the subject of regulation or that such gatherings do not pose dangers which require prior notice and a permit.

The majority states that the criteria for enforcement may not "discriminate against First Amendment activity, *e.g.*, whether a person has a sign, or whether

1. G.A. refers to Government Appendix.

2. *See* note 9 *infra*.

the sign has an acceptable message." Majority Op. at 728. In fact, picketing is one form of conduct specifically included in the definition of "public gathering" in which the majority sees "no constitutional objection." Clearly the Government can choose to regulate the type of conduct known as picketing by requiring a permit. What the Government is constitutionally prohibited from doing, as the majority correctly notes, is discriminating in the enforcement of the regulation on the basis of the message conveyed by that sign.

The majority also concludes that it would be "absurd" to apply the regulation to a single demonstrator and suggests the redefinition of "public gathering" in terms of a group of some minimum size, which would completely exempt individuals from the permit requirement. In United States v. O'Brien, *supra,* the Court held that the application of a statute which involved "incidental limitations on First Amendment freedoms" to a *single* public demonstrator was constitutional. In my opinion, the National Park Service can similarly apply the instant regulation to individuals as well as groups that engage in conduct for which a permit may be required. Several considerations support this conclusion.

A major purpose of the requirement that demonstrators apply for a permit is to provide the authorities with advance notice of proposed uses of the White House area so that appropriate precautionary measures may be taken for the safety of all concerned. This need is at least as great if 50 individual demonstrators propose to appear at the same time as it is in the case of one group of 50 demonstrators. In fact, the need for advance notice is even greater where an individual or small group intends to take a position hostile to or provocative of other demonstrators lawfully in the area.

The need for being alert to *all* possible threats to the President and to the White House is also justification for requiring permits of single individuals engaged in expressive conduct. After all, *every* assassination of a President in our history was the work of a single individual and only one (Booth) had known confederates. The two most recent penetrations of the White House security barriers were also by single individuals—one landed in a helicopter and one, Marshall Fields, Jr., as recently as December 25, 1974, crashed the gate in an automobile and appeared to be wired to explosives.[3] Admittedly, the permit requirement will have little effect on individuals with such purposes in mind, but it cannot be said with certainty that the restriction has no deterrent value. If we were to limit the permit requirement to groups and exempt individuals therefrom, we could be excluding those that history has demonstrated pose the most serious threat to our Presidents, *i.e.*, individuals acting alone. I can not join in suggesting the adoption of such a deficient regulation. To do so under the guise of protecting free speech would deny necessary protection to the President, the White House and its other occupants. To my mind the majority opinion does not fully recognize the nature of the security threats that the record and history reflect are traditionally directed against the President and the White House.

While I thus believe that the Government's power to require permits of those who desire to demonstrate in the White House area is not as limited as the majority suggests, the present language of the regulation seems insufficient to support its enforcement in the manner indicated by Government counsel. If it is to be applied to individuals as well as groups, the definition of "public gathering" should be clarified to give notice of exactly who must apply for a permit.

3. Secret Service personnel testified in this case that persons intent on "assaulting a President" could "run a car through a gate . . . . Those gates aren't secure, they are decorative fences that mark off the perimeter of the [White] House. They are not security fences." G.A. IIIA, 302.

II

The foregoing opinion also strikes the exemption for "NPS events" and requires the National Park Service to get a permit from itself for events which its sponsors that would fall within the definition of a "public gathering." This seems a somewhat useless exercise. However, this alteration of the regulations might produce some good by requiring that permit applications for all White House area events be cleared internally through the same section of the National Park Service. It will also encourage *coordination* of those agencies concerned with presidential and White House security matters, which was one of the recommendations of the Warren Commission.

III

I concur in approving the denial of permits where the application and investigation indicate a "clear and present danger to the public safety, good order or health."[4] To my mind "good order" includes some right to deny permits to applicants who would use the facilities in a manner incompatible with the normal use of the White House and its environs.

IV

This brings us to the maximum number of demonstrators who may be granted a permit to use (1) the White House sidewalk on Pennsylvania Avenue and (2) Lafayette Park.

In 1967, with the Attorney General (Ramsey Clark)[5] and Department of the Interior and Secret Service personnel participating,[6] it was decided that permits would be granted for groups of up to 100 persons to use the White House sidewalk and up to 500 persons to use Lafayette Park. The subsequent application of these limitations led to protracted litigation which has involved several instructional remands from this court. In the interim the instant regulations were promulgated. These originally carried forward the 100/500 limitations.[7] Following our last remand the trial court ruled[8] that any limits of less than 750/3000 would be more restrictive than is essential for the protection of the President and the White House and for the protection of the other interests asserted by the Government.[9] This increase to 750/3000 from 100/500 resulted from the remands of this court as interpreted by the trial court. To conform to the court's orders, the National Park Service on September 4, 1973, amended its regulations to incorporate the 750/3000 limitations.[10]

I continue to adhere to the views concerning the reasonableness of the 100/500 limitations expressed in my dissenting opinion in A Quaker Action Group v. Hickel.[11]

To my mind the 100/500 limitations were reasonable and proper and the evidence of record was sufficient to support them. Mr. Rowley, Director, U.S. Secret Service, testifying as an expert on the security considerations applicable to the President and the White House, stated:

> A We feel [that] you can [better] contain 100 people [in a confrontation situation] with a minimum [show] of

4. 36 C.F.R. § 50.19(f)(2) (1973).

5. G.A. IA, 64.

6. *Id.*, 65.

7. 36 C.F.R. § 50.19(g)(2), (3).

8. A Quaker Action Group v. Morton, Civ.No. 688–69 (D.D.C. Aug. 28, 1973), entered following remand by this court in A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 356, 460 F.2d 854, 864 (1971).

9. G.A. IA, 84:

b. Rights of citizens to use the sidewalks and the streets in front of the White House and Lafayette Park for the normal uses for which they are provided and maintained.

c. Safety of citizens using facilities as in b. above.

d. Safety of demonstrators.

e. Ecology of Lafayette Park.

f. Alternate locations for large protests.

10. 38 Fed.Reg. 24218 (Sept. 6, 1973).

11. 139 U.S.App.D.C. 1, 4–9, 429 F.2d 185, 188–193 (1970).

force and in low key[,] and keep them under control[,] than you could with any greater [show of] force[.] * * * [In our view] the greater the [show of] force [by the Government], the greater your security appearance [will necessarily be.] * * * [A]nd the greater your security appearance[,] * * * the greater [will be the chance that violence will be sparked during any confrontation. The opportunity presented to militants to create a violent confrontation is greater, if we] convey [that our defensive forces are operating] under a fortress or military condition.

G.A. IIIA, 244–45 (Brackets in original).

> What * * * [I'm] trying to convey is that we * * * [believe in] maintain[ing] * * * [a] low [security] profile [around the White House], and avoiding any appearance * * * that we are in a military [garrison state] or under military rule[,] or something of that nature[.] * * * [That] might be the [very] objective * * * some of the [dissident] people [seek] to convey * * * [in order] to bring [noncommitted persons as] sympathizers into their [dissident] ranks.

*Id.*, 246–47.

> A I'm saying this is what we have in effect today. There's no [show of a garrison-like appearance during] demonstrations, there's nothing * * * [to indicate that we are expecting to have to deal with confrontation and violence occurring during the demonstration,] * * *. And with * * [our low-key security force] appearance, [we convey the impression that we expect] nothing untoward * * * [to be] happening in the Government[,] except that the President is functioning in the normal course of his daily work[, while the demonstration is peaceably taking place in the immediate vicinity of the White House].
>
> Q How does conveying to the public that there is no concern over the President's security, because you don't have so many armed people around there, add to his security?
>
> A I think [what] * * * we are trying to convey [is that,] without any [abhorrent garrison-like appearance,] we are conducting our [security] work efficiently[, and this helps conduce peaceable demonstrations, without confrontations sparking any violent outbreaks].
>
> Q You say on page 8 of your affidavit, "It is, of course, possible to protect the White House against assaults from Pennsylvania Avenue by the use of sufficient personnel armed with adequate weapons." That's the same point, [Dep. 100] but you don't want to do that, you'd rather have a low profile; is that the point?
>
> A That's right.
>
> Q On page 9 you said, "Additional military type devices have been considered and rejected as both dangerous and inappropriate to the area."

*Id.*, 248–49. Later Director Rowley gave his expert opinion that the available Secret Service personnel would be able to handle the situation if a 100-person limitation was maintained with respect to the White House sidewalk.

> [the 100-person limitation] would enable us to contain any group of that size *with what we have present at the present time in the form of security personnel [in front of the White House].*

*Id.*, 264 (emphasis added).

All this is in keeping with the need for maintaining a "low profile" of security forces around the White House.

> We [must] provide a secure environment in which he can carry out the duties of the Presidency. Now, in that regard, we feel that what the American people want[,] and what is necessary [for us to maintain] in this country * * * [considering the nature of our] democracy, is not to have [the White House maintained as] a fortress in which the President lives and carries out his [Presidential] office [duties]. We feel that [maintaining a

> fortress—] kind of * * * security [around the White House] merely exaggerates the [protective security] problem that is caused when people [see that we] have a heavy security force [present as] necessary to keep demonstrators in line.
>
> We [strive to] maintain * * * comparatively few officers visible around the White House[.] * * * [A]nd all of our security measures are * * * [centered] around this [basic] concept that we ought to have our protective] security [force] as invisible as it possibly can be in our society.

*Id.,* 287. Director Rowley was testifying that based on his experience, he considered that the presence of an expanded uniformed White House security force necessary to control a large crowd of demonstrators might prove to be provocative to the demonstrators whereas a smaller group of security officers would not be provocative. Recent experience in a number of militant confrontations at the White House has proved the wisdom of this conclusion.

In my opinion, the foregoing excerpts from the record are sufficient evidence to sustain the 100/500 limits prescribed in the regulation and to prevent this court from embarking on its own legislative scheme which amounts to nothing more than the imposition of judicial government. The fact that the trial court found that larger demonstrations in the past had not posed a serious threat to the President is no justification for authorizing higher limits. All that experience proves is that, *to date,* larger groups have not degenerated into unruly mobs or been used successfully as shields for aggressive action against the White House or its occupants, but that is no guarantee for the future. Also, increasing the number of allowable demonstrators because larger groups have not gotten out of hand in the past ignores the expert testimony of the Secret Service that the 100-person limitation was what the security personnel at the White House were presently able "to contain." *Id.,* 264.

Of course, the Secret Service could meet the larger threat of the 750/3000 limitations, but that would require a substantial enlargement of the security personnel surrounding the White House. Congress would have to appropriate substantial additional funds. This would be in addition to the several million dollars per year recently provided by Congress because of increased militant activity.[12] The question is why should the Secret Service be required to increase its White House force or why should Congress be required to appropriate more money. The 100/500 limits, with any overflow using the nearby Ellipse, to my mind reasonably accommodate all conflicting interests and rights. To increase the limits sevenfold will attract larger demonstrations and the White House will then appear to be a citadel with security personnel bristling everywhere. That is not my idea of the proper use of the White House or of the appearance that the citizens of our country desire it to present. The White House is intended primarily as a residence, not an American Hyde Park. As the Secret Service personnel testified, the large increase in security personnel required by the increased limits can be a factor that incites violence. To best discharge their assigned mission, they therefore desire to maintain a non-provocative "low profile." Since the 100/500 limitations, with the Ellipse handling any overflow, adequately recognize all First Amendment rights, I would approve such limits.

The majority opinion recognizes that it might be necessary to erect "a barrier" around the White House and seeks comfort in the possibility that this "barrier" might have "an acceptably open aspect." Majority Op. at 736. However, it is very difficult for a barrier to give the appearance of being open and still fulfill the function of a barrier. The majority

12. *See* Pub.L. 91–217, 84 Stat. 74, 91st Cong., 2d Sess., Mar. 19, 1970, amending 3 U.S.C. §§ 202–207 to establish the Executive Protective Service and increase the security force from 250 to 850.

wants to carry water on both shoulders. This discussion, more than anything else, really discloses what the majority opinion may do to the environs of the White House if their suggestions were to be followed.

## V

Whatever limits on the number of demonstrators are adopted, I do concur in permitting the waiver of such limits after a proper showing. This will permit the exercise of some judgment in evaluating the provocative nature of a proposed gathering. In addition to this authority to increase the limits, I also believe that the regulations should permit the National Park Service to impose lesser limits in those cases where smaller groups might pose a larger than ordinary threat.[13] This is only a slight modification of the right and duty to deny permits altogether where too great a threat is posed.

## VI

The foregoing opinion strikes out of the regulation the provision limiting permits to no more than seven consecutive days and no more than 24 consecutive hours. This provision was apparently viewed as being designed to allow the allocation of scarce space to competing demonstrators. If it had this limited purpose, the majority might be correct in finding it to be unduly restrictive and in requiring the NPS to consider each application individually. However, the area in question is intended for official use by the President, his staff and those having business with the Executive branch of the Government, and for use by citizens who have no desire to convey a message (*e. g.,* everyday pedestrians and visitors to the nation's capital) as well as by citizens bent on exercising their First Amendment freedoms. The seven day-24 hour restruction appears to me to be a reasonable attempt to balance the interests of all citizens in the use of the White House area. Certainly no group is entitled to exclude the rest of the nation from these public areas for an extended period of time. If anything, the regulation is overly solicitious of the interests of demonstrators.

Rather than eliminating the seven day-24 hour provision, if flexibility is desired, the better course would be to provide for waiver upon an appropriate showing as was done with the numerical limitations.

## VII

The majority suggests the adoption by the NPS of standards to be applied in revoking permits. As I see it, these standards are already in the act, *i. e.,* the same standards that would justify the denial of the permit in the first instance.[14]

I respectfully dissent from the majority opinion to the extent it is inconsistent with my views as set forth above. Subject to the foregoing exceptions, I concur in the other holdings of the majority opinion. However, I consider the paragraph immediately preceding the Conclusion, Majority Op. at 735–736, *supra,* to be unnecessary to our decision. Too frequently our dicta cause future strains rather than avoid them.

---

13. For instance, if the Palestine Liberation Organization requested a demonstration permit for 600 and 2500, the Park Service might well consider granting a permit for smaller numbers.

14. 36 C.F.R. § 50.19(f).